**TEXTRON, INC., Plaintiff,**

v.

**TELEOPERATOR SYSTEMS CORP. and Carl R. Flatau, Defendants.**

**No. 82–CV–3298.**

United States District Court,
E.D. New York.

Jan. 10, 1983.

George M. Sirilla, Robert W. Adams and Bryan H. Davidson, Cushman, Darby & Cushman, Washington, D.C.; Robert M. Callagy and James F. Rittinger, Satterlee & Stephens, New York City, for plaintiff.

Jeffrey M. Siger and David L. Katsky, Esanu, Katsky, Korins & Siger, New York City, for defendants.

## DECISION AND ORDER

BRAMWELL, District Judge.

On October 29, 1982, plaintiff commenced the instant action by the filing of a summons and complaint along with an application for a temporary restraining order and preliminary injunctive relief. The application for a temporary restraining order was granted conditioned upon the posting of a one million dollar surety bond. On November 10, 1982 the court denied defendants' application to modify the temporary restraining order and continued it in full force and effect.

The hearing on the preliminary injunction was convened on November 17–20, 1982 during which documentary evidence and the testimony of several witnesses was received. Today, pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the court disposes of that application.

## FINDINGS OF FACT

1. Plaintiff, Textron Inc., is a corporation organized under the laws of the State of Delaware, having its principal place of business at 40 Westminster Street, Providence, Rhode Island. Plaintiff conducts its operations in the United States through a number of Divisions. One of these Divisions is the Bridgeport Machines Division (hereinafter referred to as Bridgeport), having its principal place of business located at 500 Lindley Street, Bridgeport, Connecticut. (complaint, para. 2 and Jahnke affidavit, para. 2).

2. Defendant, TeleOperator Systems Corp. (hereinafter referred to as T.O.S.) is a corporation organized under the laws of the State of New York, having its principal place of business at 45 Knickerbocker Avenue, Bohemia, New York. (complaint, para. 3).

3. Defendant Carl R. Flatau (hereinafter referred to as Flatau), a recognized expert in the field of robotics, is the president and principal stockholder of T.O.S.

(complaint, para. 4; 323; 388–91 *; D.Ex. K ** ).

4. For many years Bridgeport has been in the business of making and selling machine tools, such as vertical milling machines. Over the past ten years, it has been making and selling milling machines provided with computer numerical control units (hereinafter referred to as CNC units). Bridgeport manufactures its milling machines at facilities in Bridgeport, Connecticut. It has an operating facility in Horsham, Pennsylvania that develops, designs and manufactures CNC units that are subsequently integrated with various mechanical machines or tools, such as milling machines, at Bridgeport's manufacturing facilities in Bridgeport, Connecticut. (28–31).

5. In 1980, Bridgeport became interested in large scale or volume production and sale of robots for industrial uses, such as in the automotive industry. In that regard, Bridgeport became aware of the functional performance requirements or specifications of General Motors Corporation for industrial robots called the PUMA system (programmable universal machine for light assembly). (31–34, 36, 87–88, 259–61; Pl.Ex. 13 *** ).

6. In furtherance of this goal and, more specifically, in order to ascertain the names of robotics specialists, Gerald McCaul (hereinafter referred to as McCaul), Vice President for Strategic Planning of Bridgeport/Machines travelled around the United States visiting major manufacturers and buyers of robots, attending conferences on robotics and conferring at research universities working in the field. (Tr. 260–61, 264–65, 307–08; D.Ex. J).

7. During the course of these visits faculty members at the Massachusetts Institute of Technology recommended Flatau to McCaul as an outstanding expert in the design of manipulators and robots. (261).

8. Based on these recommendations, McCaul decided to approach T.O.S. and Flatau because of his expertise in the field. In June of 1980 McCaul wrote to Flatau. (261, 265, 307–09, 312–13, 317, 398, 403; Pl.Ex. 1, 28, 29).

9. Prior to any contact with Bridgeport, T.O.S. was already involved to a considerable degree in the designing of so-called manipulators or manipulator arms adapted for remote but direct operation by human beings in special environments and applications, as distinguished from design work relating to industrial robots that are programmable for automatic operation in connection with the commercial manufacture of other products. (221–22, 262–63, 399, 310).

10. In July 1980, in response to McCaul's letter, Flatau met with McCaul at T.O.S.'s office. At that meeting, Flatau showed McCaul a film about the robotics technology already developed by T.O.S. (398; D.Ex. M).

11. The technology displayed in the film and described in finding of fact number 9 was not directly applicable to what Bridgeport was looking for—that is inapplicable for use with industrial robots automatically programmed to engage in the commercial manufacture of other products. (262–63, 310–12, Pl.Ex. 28, 29).

12. In the latter half of 1980, Bridgeport initiated discussions with T.O.S. and Flatau about the design capabilities of T.O.S. in the remote manipulator field and possible application of that capability to industrial robot design. During those discussions Bridgeport provided T.O.S. with a copy of the specifications for the aforesaid PUMA system and requested T.O.S. to prepare a proposal for the design of the mechanical features of an industrial robot that would be integrated with a CNC unit developed by Bridgeport to automatically control and

* Numbers in parentheses denote reference to the page(s) of the transcript of the hearing held on November 17–20, 1982.

** "D.Ex." denotes reference to the lettered exhibit introduced by defendants at that hearing.

*** "Pl.Ex." denotes reference to the numbered exhibits introduced by plaintiff at the hearing.

program its operation as desired. (36–37, 261–63, 266–67, Pl.Ex. 1).

13. Flatau prepared such a design proposal for T.O.S. and submitted it to Bridgeport on January 30, 1981. That proposal expressly contemplated the design of an industrial robot and the fabrication of one prototype, with the specific stated goal of large scale or volume production by Bridgeport. On pages 2 and 3 of the T.O.S. design proposal, Flatau discussed the then "existing state of the art" in the industrial robot field. No mention was made therein of any prior work done by him or T.O.S. in that field. In addition, the T.O.S. design proposal estimated that the design phase would require 600 hours of engineering time, 1600 hours of design time, and 600 hours of drafting time while 2600 hours of machine shop time were estimated for prototype fabrication. The estimated cost was about $250,000. (41–46; Pl.Ex. 2, 2A).

14. On pages three and four of the January 30 design proposal, under the heading of "CONTRACTUAL REQUIREMENTS" appeared the following:

1. T.O.S. will perform the work on a cost plus basis.

2. A Progress Payment arrangement is required.

3. A Proprietary Technology Agreement is required. This must address and define the rights of Bridgeport Machines in the design. It also must define the rights of T.O.S. in its own technology.

4. A Hold Harmless Agreement with respect to product liability of Bridgeport Machines sales on the design will be required.

5. T.O.S. also desires other participation in the sale efforts. This would include furnishing of application engineering services where required. In addition, we seek an arrangement enabling "TOS" to use the production hardware for devices equipped with more advanced features; e.g. force transducers, or intelligent controls for the University Research Market. This could take the form of a Dealer-

ship in the Robotics segment of Bridgeport equipment. The main advantages of such an arrangement to Bridgeport Machines would be that a continuous dialogue with advanced developments in the field would be created. As it is expected that the field of Robotics will mature quite rapidly, such a procedure would allow Bridgeport Machines to stay ahead of technological developments in the industrial sector.

(Pl.Ex. 2A).

15. At a meeting held on February 9, 1981, Bridgeport advised T.O.S. to proceed with the program as outlined in the January 30 design proposal. The substance of this meeting was embodied in a February 10, 1981 letter of intent from Bridgeport to T.O.S. (Pl.Ex. 3).

16. This letter addressed each of the "CONTRACTUAL REQUIREMENTS" embodied in the January 30 T.O.S. design proposal. With respect to requirement Nos. 3 and 5, quoted above, it specifically provided that:

3. TOS will have rights to apply developed technology to noncompetitive applications. Namely, manipulator, this will receive a more finite definition in the future."

5. As discussed, we have a general agreement that TOS participation in some form of the sales effort will be beneficial to both TOS and Bridgeport/Textron. This matter will also receive further definition in the future."

(Pl.Ex. 3)

17. On February 16, 1981 Flatau wrote back to Mr. William R. Jahnke (hereinafter referred to as Jahnke), Vice President of Engineering for Textron/Bridgeport acknowledging the February 10 letter and detailing the costs involved in executing the design proposal. The letter indicated the work would be done at cost plus 20 per cent. (Pl.Ex. 5).

18. The February 16 letter from T.O.S. contains no language disagreeing with

paragraph 3 of the February 10 Bridgeport letter of intent. Had defendants so disagreed at that time, plaintiff indicated that it would have cancelled the project. (Pl.Ex. 5, 49, 52, 222–23, 338, 413–14).

19. As a result of the agreements embodied in the foregoing exchange of correspondence, Bridgeport issued, and T.O.S. accepted, its March 16, 1981 Purchase Order, No. 24881, stating in pertinent part:

"Design 5 KG Industrial Articulated Manipulator Arm in general accordance with G.M. specification for programmable universal machine for light assembly, attached, and T.O.S. design proposal dated 30 January 1981. Bridgeport will design a computerized Control for this manipulator on a closely coordinated basis.

(Pl.Ex. 6; 54–58).

20. The purchase order provided for performance by T.O.S. on a cost plus 20% fee as per the February 16, 1981 letter from Flatau to Jahnke. It also specifically provided on page 6 that:

Other terms and conditions will be covered in a separate agreement.

(Pl.Ex. 6).

21. The purchase order specified a higher upper limit payment by Bridgeport to T.O.S. of $450,000, rather than $250,000 as estimated in the original T.O.S. design proposal, because the purchase order called for assembly and testing of three prototypes, whereas a single prototype was initially contemplated. (56–57).

22. At no time during the foregoing exchange of correspondence in January-March 1981 did either T.O.S. or Flatau advise Bridgeport or Textron that T.O.S. or Flatau would claim the rights to any inventions and technology developed by T.O.S. for Bridgeport during the course of this business relationship. Furthermore, at no time during this exchange of correspondence did either T.O.S. or Flatau contradict the statement contained in the Bridgeport letter of intent that T.O.S. would only have the limited right to apply technology developed during this business relationship to "noncompetitive applications." Had defendants done so, Bridgeport claims that it would

have terminated the project at that time. (49–52 and 63–65).

23. By letter of March 18, 1981 from Flatau, T.O.S. submitted to Bridgeport its first invoice and technical progress report for this project, which was given the code name "TIGER" (or sometimes TIGER 5, the "5" standing for the 5 kilogram load the robot was intended to lift). At the end of the progress report, T.O.S. discussed the design configuration it had adopted for the project and further stated:

"The principle for this (configuration) is directly derived from a T.O.S. patented design for manipulators. Use of this patent for TIGER can be obtained by means of a $1 paid license."

(67–69, Pl.Ex. 7)

24. The patent referred to in the plaintiff's exhibit seven is United States Patent No. 4,062,455 entitled "REMOTE MANIPULATOR" and granted December 13, 1977, in the name of Carl R. Flatau, as patentee. (Pl.Ex. 7, 34; 451–52).

25. In conformity with the March 16, 1981 purchase order all technical drawings prepared by TOS for the TIGER–5 project were on paper bearing the name "Bridgeport ® Textron, Bridgeport Machines Division of Textron Inc.," as well as the following proprietary legend:

"This document/drawing provides information which is proprietary to Bridgeport Machines and is made available to you for the use and maintenance of our products. Any use, reproduction, or dissemination of this information for any other purpose is prohibited without written permission."

(60, 70–71, 226–28; Pl.Ex. 6, 8, 8A, 8B).

26. When T.O.S. began using the printed Bridgeport drawing paper as described above in late March—early April of 1981, Robert L. Minter, then a designer and later a vice president of T.O.S., explicitly directed Flatau's attention to the aforesaid Bridgeport proprietary legend on the TIGER project drawings and he advised Flatau that, based on his 30 plus years of experience in the design field, the language contained therein meant that Bridgeport

owned all rights to the designs embodied in those drawings. Despite being so advised, Flatau told Minter that T.O.S. should continue to use the aforesaid Bridgeport drawing paper forms in the TIGER program. (217–19, 226–29).

27. In April of 1981, Gerald McCaul, then a senior vice president of Bridgeport, felt it incumbent upon him to clarify with Flatau the exact meaning of the words "[o]ther terms and conditions will be covered in a separate agreement" on page six of the March 16, 1981 purchase order. (Pl.Ex. 6, 274–75).

28. Accordingly, in April 1981 McCaul gave Flatau a draft purchase order that McCaul had previously prepared outlining in greater detail the relationship of the parties based upon prior discussions between McCaul and Flatau. In pertinent part, this draft purchase order states as follows:

T.O.S. will prepare patent applications for processing by Bridgeport for all proprietary technology developed on this purchase order. Bridgeport will grant T.O.S. a royalty free license to utilize these proprietary developments in any non-competitive T.O.S. future designs.

T.O.S. agrees to license Bridgeport on a royalty free basis for any T.O.S. patented earlier developments which are included in this design.

Bridgeport agrees to sell production versions of this device to T.O.S. for modification and resale into the noncompetitive high technology university research market. In return, T.O.S. will keep Bridgeport informed of any interesting and importing [sic] developments from that source for possible production use.

Bridgeport expects to utilize T.O.S.'s manipulator technology and experience over a five year period for design of volume production based on successful completion of this initial project. Commitment would be for at least as many man hours as realized in the 1981 time period. (D.Ex. A, 271–75).

29. When presented with this document by McCaul, Flatau expressed no objections

to any of its terms. (275). Moreover, Flatau and McCaul thereafter continued performance under the TIGER–5 program which was paid for in accordance with a system of monthly invoices submitted to Bridgeport. (73–75, 83–84, 246; Pl.Ex. 6, 10, 12; D.Ex. A).

30. On June 15, 1981, McCaul forwarded to Flatau the suggested agreement between the parties. Consistent with the language in the letter of intent and the draft purchase order, the suggested agreement contemplated that Bridgeport would own all patentable proprietary technology developed during the TIGER program and that Bridgeport would grant T.O.S. a royalty-free license to utilize such inventions in non-competitive applications. It also granted Bridgeport a royalty-free non-exclusive license for any previously patented T.O.S. developments included in the TIGER design. Furthermore, the agreement provided that Bridgeport would make reasonable efforts to sell production robots to T.O.S. for modification and resale by T.O.S. in the non-competitive university research market and that Bridgeport would make reasonable efforts to utilize T.O.S.'s design services in the future contingent upon successful completion of the initial TIGER project. (211–14, 275–77, 298–99; D.Ex. B, C).

31. T.O.S. and Flatau remained silent with regard to the suggested agreement by Bridgeport except to advise McCaul that the agreement was being considered. Defendants made no objection to its terms. Said proposed agreement was never signed by Flatau or T.O.S. (277–78, 377–82).

32. In February 1982, T.O.S. sent to plaintiff for review a draft agreement, which gave plaintiff "the exclusive use of systems designed under this agreement" and further stated:

Bridgeport agrees hereby guarantees [sic] an annual minimum business volume of $1,000,000.00 starting in fiscal year 1982, and continuing thereafter at that rate, subject to adjustments for inflation based on the national wholesale index.

This agreement proposed by T.O.S. was never executed by the parties (D.Ex. E; 192, 386).

33. Work on the TIGER project continued through the end of 1981. During that time, T.O.S. advised Bridgeport on or about November 6, 1981 that there would be a significant overrun of One Hundred and Eighty One Thousand Five Hundred Dollars ($181,500) on the original purchase order. Bridgeport, on or about December 16, 1981, issued an amendment to increase the amount of the purchase order to Six Hundred and Thirty Thousand Dollars ($630,000). (73–75, 244, 282; Pl.Ex. 10, 11).

34. On February 22, 1982, Bridgeport issued another purchase order to T.O.S., No. 44817, for a robot design capable of lifting 10 kilograms—called the TIGER 10 project. This purchase order called for a maximum payment by Bridgeport to T.O.S. of Two Hundred Thousand Dollars ($200,000). (Pl.Ex. 14; 91–92, 240–41).

35. During the period February–June 1982 there were additional significant cost overruns by T.O.S. Bridgeport accordingly became increasingly dissatisfied both with the progress and performance of T.O.S. In March or April 1982, Bridgeport advised T.O.S. to cease work on TIGER 10 and to finish its work on the original TIGER 5 since it was felt that the work on the TIGER 10 project would only further delay completion of the original TIGER 5 project. (Jahnke 100–01, 103–04, 106–07; Minter 240–43; Pl.Ex. 16, 18).

36. In addition to the amount in excess of $800,000 plaintiff had paid to defendants, Bridgeport spent approximately $750,000 to develop a computer numerical control (CNC) to be used in conjunction with the mechanical structures defendants were to be developing. (98–100, 280–81).

37. Bridgeport, even up to the present time, is spending significant sums of money continuing to prepare for manufacture and commercial production of the TIGER robot by designing and building production fixtures therefor, and purchasing tooling and developing manufacturing processes and computer numerically controlled machine programs therefore. (Pl.Ex. 13, 15; Jahnke affidavit para. 23).

38. In about May 1982, defendants began to work on designing and developing another industrial robot of their own. Nevertheless, defendants never advised Bridgeport of their work on this other industrial robot, even though they were working on it at the same time they were working on the TIGER project. Moreover, defendants admit there are features in this other robot that are covered by the inventions T.O.S. made for the TIGER robot. (113, 247–49, 374–76, 461).

39. On June 21, 1982, T.O.S. for the first time advised Bridgeport by a letter from Flatau that T.O.S. considered the technology content of the TIGER design depicted in the engineering drawings to be proprietary to it. T.O.S. stated that it planned to prepare and file three United States patent applications directed thereto. (105–06, 125, 165–66, 283–84, Pl.Ex. 17).

40. After receiving the June 21, 1982 letter from Flatau, Bridgeport took immediate steps to remove all of its proprietary engineering drawings and materials from T.O.S. and to terminate the relationship. In particular, Bridgeport made two trips to T.O.S., one around the end of June 1982 and the other around the beginning of July 1982 during which Bridgeport, with the knowledge of T.O.S.'s vice president Minter, removed from T.O.S. and took possession of (a) all copies of the engineering drawings for the TIGER program that could be found, as well as the original tracings, (b) the parts to complete the still unfinished second and third prototypes under the original March 16, 1981 purchase order, and (c) the first prototype. Thereafter, Bridgeport confirmed by letter to T.O.S. dated July 22, 1982, that it was cancelling all outstanding purchase orders with T.O.S. (108, 250–51, 290–91; Pl.Ex. 19).

41. In early July of 1982 the defendants issued a press release announcing "its intention to design, develop and manufacture a line of industrial robots" and citing "the successful development of a new generation

of general purpose robots for the nation's leading machine tool manufacturer [Bridgeport]" as a basis for "the company's decision to enter the rapidly growing robot field." The press release also stated that "TOS expects to have a prototype of its first model completed by the end of August." Further, it quoted Flatau as saying: "We are directing our marketing efforts to original equipment manufacturers who may be searching for robot bodies and accessories to complement their product sales." In the July 26, 1982 issue of the publication "Tech Update," an article appeared based on the aforesaid T.O.S. press release. (112–18, 171; Pl.Ex. 20, 21).

42. By letter dated August 11, 1982, Flatau returned to Mr. McCaul of plaintiff a proposed hold-harmless agreement. That agreement was ratified by Flatau conditioned upon plaintiff's ratification of a rider which he attached. That rider provided in pertinent part that:

". . . Bridgeport must obtain from TOS a license of certain patent and other proprietary rights owned by TOS."

(302–05; Pl.Ex. 22).

43. Upon receipt of the August 11, 1982 rider, Bridgeport immediately denied T.O.S.'s contention that any such license was necessary. It was Bridgeport's position that it had already paid for and owned the inventions and technology developed during the TIGER program and is already licensed under the aforesaid Flatau United States Patent No. 4,062,455 or any other earlier work of T.O.S. or Flatau embodied in the TIGER robot. The parties undertook to resolve this dispute by negotiation and conducted unsuccessful discussions to settle this matter. (305–06; Pl.Ex. 23).

44. On or about October 4, 1982, Bridgeport received a letter from T.O.S. dated October 1, 1982 and signed by Flatau, forwarding copies of portions of the three patent applications referred to in the June 21, 1982 letter from Flatau. The three applications are identified in the October 1, 1982 letter as follows: Serial No. 395,959 entitled "WRIST FOR MANIPULATOR ARM," filed in July, 1982 and naming Carl R. Flatau and Robert L. Minter as inventors; Serial No. 413,634 entitled "ROBOT FOREARM," filed in September, 1982 and naming Carl R. Flatau as sole inventor; and Serial No. 417,231 entitled "COUNTERBALANCED ROBOT ARM," filed September, 1982 and naming Carl R. Flatau as sole inventor. (Pl.Ex. 24, 35, 36, 37).

45. The record reveals that the drawings and specifications contained in the aforesaid "ROBOT FOREARM" and "COUNTERBALANCED ROBOT ARM" patent applications were expressly and deliberately based upon the TIGER project work. On the other hand, the drawings and specification for the "WRIST FOR MANIPULATOR ARM" patent application were based upon work done prior to the TIGER project. (348–54, 358–63; Pl.Ex. 30, 35, 36, 37, 38, 39, 41).

46. On Thursday, October 21, 1982, Bridgeport was advised over the telephone that T.O.S. and Flatau would accept Bridgeport's position with respect to ownership of the technology, and that counsel for T.O.S. would prepare the settlement papers and forward them for Bridgeport's consideration. Those papers were received by Bridgeport's counsel on Monday, October 25, 1982. The papers provided, in pertinent part, that (a) T.O.S. is the owner of all "Technical Information" relating to the TIGER program and (b) T.O.S. is willing to grant Bridgeport only a nonexclusive license that is non-assignable, non-sublicensable and non-transferable. As a result of plaintiff's rejection of this final offer of settlement and T.O.S.'s stated intention in its July, 1982 press release to market the aforesaid "Technical Information" to equipment manufacturers, plaintiff filed the action that brings the parties before the court and seeks immediate injunctive relief to protect its property rights. (131–38, 140–41; Pl.Ex. 25; Jahnke affidavit, para. 32).

## CONCLUSIONS OF LAW

Based on the foregoing events plaintiff argues that a valid and binding contractual relationship arose between the parties and that under that contract the TIGER tech-

nology developed by defendants is proprietary to plaintiff with defendants enjoying only a non-exclusive license to use it in non-competitive applications.[1] Moreover, plaintiff contends that it is entitled to a royalty-free non-exclusive license under any patent or proprietary rights developed by defendants prior to the TIGER project but incorporated in it.

Defendants, in sharp distinction, argue that the vesting of such ownership rights to the TIGER technology in plaintiff was conditioned upon plaintiff entering into a long-term business relationship with defendants and that since no such agreement was ever consummated the rights necessarily vest in defendants. In further support of this they argue that prior to his association with plaintiff, Flatau had already made the decision to enter the industrial robotics field and had already developed the concepts necessary to meet the "PUMA" specifications.[2] The question in the case thus resolves itself into one involving whether a contract covering ownership rights to the TIGER technology exists and, if so, what are the parties rights and obligations under it.[3] The answer to the question necessarily turns on an interpretation of the parties' words and conduct during their rather tortured relationship.

The record reveals that on the basis of defendants' January 30, 1981 design proposal a meeting was convened at T.O.S. on February 9, 1981. Present at the meeting were defendant Carl Flatau, Joseph E. Clancy, President of Bridgeport; William R. Jahnke, plaintiff's Vice-President of Engineering; and Gerald McCaul, plaintiff's Senior Vice-President for Strategic Planning at the time. Among other things, the five point portion of defendants' January 30 proposal entitled CONTRACTUAL REQUIREMENTS was discussed in its entirety. Specifically, items 3 and 5 of this section dealing with a proprietary technology agreement and future sales cooperation between the parties were discussed.

On February 10, 1981, Mr. Jahnke sent Mr. Flatau a letter of intent which expressed plaintiff's willingness to proceed with the TIGER–5 project as outlined in the January 30 proposal. It also addressed the CONTRACTUAL REQUIREMENTS portion of the proposal point by point as discussed at the February 9 meeting. With respect to point three the letter of intent provided that:

> "TOS will have rights to apply developed technology to non-competitive applications. Namely, manipulator, this will receive a more finite definition in the future."

Pl.Ex. 3.

With respect to point five the letter provided that:

> As discussed, we have a general agreement that TOS participation in some form of the sales effort will be beneficial to both TOS and Bridgeport/Textron. This matter will also receive further definition in the future.

Pl.Ex. 3.

Thereafter, Flatau wrote to Jahnke acknowledging the February 10 letter of intent. With respect to item one of the CONTRACTUAL REQUIREMENTS portion he stated that billing would be on a cost and 20% basis. Pl.Ex. 5. Subsequently, TOS performed by working on the project and

---

**1.** Plaintiff defines non-competitive applications to mean (i) robots that are used for work not involving the commercial production of goods for sale, (ii) robots used in unusual environments such as vacuum, nuclear and/or underwater, (iii) robots used for educational or research purposes or (iv) precision mini-assembly robots.

**2.** The court rejects defendants' attempt to rely upon a purported distinction between an agreement to "design" and an agreement to "invent" as militating in its favor. It represents the ultimate in exaltation of form over substance. In either case, one employing another person for valuable consideration would fully expect that the fruits of the employees' labor would be property of the employer. Here, to seize on such a meaningless distinction to deprive plaintiff of the benefit of $800,000 in expenditures would be preposterous.

**3.** Plaintiff offers three alternative noncontractual theories on which it can recover. In view of the court's ruling today, however, it need not reach them.

submitting monthly invoices and progress reports as per item 2 of the REQUIREMENTS.

Finally, on March 16, 1981, plaintiff forwarded a 6 page purchase order for the design of 3 prototype TIGER–5 robots as per the defendants' January 30 proposal. "TIGER–5" signified a robot with a capacity to handle loads of up to five kilograms. This purchase order reflected billing on a cost plus 20% basis per defendants' February 16 letter. It reflected that drawings were to be on Bridgeport forms. Finally, it reflected that other terms and conditions ". . . will be covered in a separate agreement."

Characterizing this purchase order as the ". . . only written contract between the parties." (Defendants' proposed Finding of fact 20) and indicating that as such it failed to specifically address the issue of property rights in the TIGER technology or the long term relationship between the parties defendants' come to the conclusion that they, and not plaintiff, are the rightful owners of the technology. The court, however, cannot view the record quite so narrowly and for that reason rejects this rather strained construction of the dealings between the parties. It simply ignores too much of what transpired between the parties and the legal effect of these events.

■ It is hornbook law that a party can manifest its assent to an offer by silence, or as in this case, silence coupled with performance consistent with the offer. *See* Restatement, Contracts 2d §§ 18, 19, 53. Here, the February 10 letter of intent from plaintiff to defendant Flatau specifically provided that it was a ". . . letter of intent to *proceed* with the program as outlined in [the] letter of 30 January 1981." (Emphasis the court's) (Pl.Ex. 3) Flatau himself so viewed the letter and said as much in instructing Jahnke to go forward with the job. (Tr. 222) The situation at hand is made even more compelling as more than silence exists—defendant having acknowledged receipt of the letter of intent in his reply of February 16 without objection. (Pl.Ex. 5)

Specifically, the court finds that the exchange of the January 30 proposal, the February 10 letter of intent, defendants' February 16 response to the letter, and the March 16 purchase order coupled with defendants' performance without objection constituted a legally binding contract. *V'Soske v. Barwick,* 404 F.2d 495 (2d Cir. 1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969); *Frank Horton & Co. v. Cook Electric Co.,* 356 F.2d 485 (7th Cir.1966).[4] The correspondence, when taken together, more than adequately set out price, quantity, time for performance, and, significantly, defendants' limited ownership rights in the TIGER technology as applied in the industrial robotics field. It was a contract that was sufficiently definite to be enforced.

As stated above, point three of the February 10 letter of intent embodied an oral understanding reached at the February 9 meeting between the parties—that understanding being that T.O.S. would receive only a non-exclusive license to utilize the TIGER technology in non-competitive applications. Furthermore, Flatau, in his February 16 acknowledgement of the letter of intent nowhere objects to the inclusion of the foregoing language. It was at this point that the court feels the parties' understanding on this point became concretized.

The March 16 purchase order merely served to confirm what had already been agreed to by the parties in correspondence ending on February 16. It was, more than anything else, issued in conformity with this agreement and not as a final memorialization of it. The "other terms and conditions" language on page 6 of the purchase order that defendants' view as crucial to

---

4. Defendants' attempt to distinguish these two cases is unavailing. The fact that the parties to be charged were the ones who prepared the letter of intent in those cases is a distinction without significance since the ultimate issue in this case, as in those, was whether there was agreement among the parties. When viewed in this light defendants' hypertechnical distinction can serve no useful purpose.

their case would therefore in no way detract from this conclusion. Even if the court were to accept defendants' characterization of the purchase order as "the" controlling document the same conclusion would follow. The letter of intent stated that:

3. TOS will have rights to apply developed technology to non-competitive applications. *Namely, manipulator, this will receive a more finite definition in the future.*

(Emphasis the courts)

The only rational interpretation of the "other terms and conditions" language of the purchase order would be that it was applicable to the italicized portion of the foregoing clause and not the first portion dealing with the parties' agreement that TOS's rights in this new technology would be limited. Therefore, it would in no way detracts or alters the agreement that plaintiff would be the rightful owner of the technology. This interpretation is further borne out by the language contained in the April 1981 proposed draft purchase order (D.Ex. A) and the proposed June 15, 1981 agreement (D.Ex. B, C) providing for T.O.S.'s right to use the TIGER–5 technology in, among other areas, the non-competitive university research market. See note 1, *supra.*

Accordingly then the court finds that the parties, via the exchange of correspondence ending on February 16, followed by performance, entered into a contract whereby plaintiff was to acquire exclusive ownership rights in technology developed by Flatau and TOS during the TIGER project with defendants enjoying only a non-exclusive license to use it in non-competitive applications.[5] The court turns now to an examination of the parties' rights to technology developed by Flatau prior to the parties association.

[3] Flatau, in his first invoice and technology progress report of March 18, 1981 offered plaintiff the use of the patented design for manipulators covered under Patent No. 4,062,455 entitled REMOTE MANIPULATOR granted to Flatau on December 13, 1977 for a $1 paid license (Pl.Ex. 7, 34). The record reveals that the technology covered under this patent was utilized, to some extent, during the course of the TIGER project. In addition, the technology embodied in the patent entitled "WRIST FOR MANIPULATOR ARM," (Pl.Ex. 35) filed in the name of Flatau and Robert L. Minter in July of 1982 would cover certain of the designs and structures during the TIGER project. This technology was also developed by Flatau prior to his association with plaintiff. (Pl.Ex. 30, 35, 363). Unlike the case with the ROBOT FOREARM and COUNTERBALANCED ROBOT ARM developed exclusively during the course of the TIGER project, however, there does not appear to have been reached any sort of contractual arrangement with respect to these latter two designs. This conclusion flows from the fact that none of the proposals or counterproposals purportedly dealing with rights to this technology were ever initialled by both sides. (D.Ex. A, B, C, E, N). Moreover, the court finds that the language limiting defendants' right to apply "developed technology" in a non-competitive fashion only contemplated technology developed during the TIGER project and thereby wouldn't limit defendants rights to use the WRIST FOR MANIPULATOR ARM or REMOTE MANIPULATOR in any way it saw fit.

Thus, unlike the technology developed for and at the behest of plaintiff this earlier technology did not become the subject of an express understanding followed by performance—rather there was an uncertain performance only from March 1981 to June 1982 unaccompanied by any sort of verbal agreement.

---

**5.** The court also notes that to the extent the parties never did consummate any arrangement with respect to a long-term association this too was consistent with the contract which contemplated successful completion of the TI-GER 5 prototypes. The record reveals that such was not the case—the project going way over budget and producing little in the way of anything usable by plaintiff.

■ Under the circumstances the court is unable to discern any mutually agreed upon arrangement with respect to these rights. Performance alone is simply not enough absent some sort of document initialled by both sides as was the case with the technology developed during the project. This is especially so since the letter of intent specifically left open the issue of rights to the manipulator technology for more "... finite definition in the future." Moreover, McCaul testified that at the time he prepared his proposals in April and June of 1981 he was aware that such loose ends existed. *See* Finding of Fact 27. Accordingly then, the court finds that defendants remain the rightful owners of the disputed technology they developed prior to the TIGER project. Plaintiff, therefore, enjoys ownership in the TIGER technology subject to such preexisting rights of defendants.[6]

### INJUNCTIVE RELIEF

With the foregoing background in mind, the court now turns to an examination of plaintiff's request for preliminary injunctive relief.

In this circuit, a moving party may obtain a preliminary injunction if it establishes (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief.

*Sperry International Trade, Inc. v. Israel,* 670 F.2d 8 (2d Cir.1982). *Crouse-Hinds Co. v. Internorth, Inc.,* 634 F.2d 690 (2d Cir. 1980); *Seaboard World Airlines, Inc. v. Tiger International, Inc.,* 600 F.2d 355 (2d Cir.1979); *Sonesta International Hotel Corp. v. Wellington Associates,* 483 F.2d 247 (2d Cir.1973); Mulligan, *Foreword-Preliminary Injunction in the Second Circuit,* 43 Brooklyn L.Rev. 831 (1977).

■ Here, Flatau, notwithstanding the parties' February 1981 agreement concerning ownership of the rights to the TIGER technology, and their performance under it, took the position in June and July of 1982 that such technology was proprietary to him. (Pl.Ex. 17, 20, 21). Consistent with this position Flatau instructed his patent attorney to file three patent applications, *viz,* patent # 395,959 entitled "WRIST FOR MANIPULATOR ARM"; patent # 413,634 entitled "ROBOT FOREARM"; and patent # 417,231 entitled "COUNTERBALANCED ROBOT ARM." (Pl.Ex. 24, 35, 36, 37) The ROBOT FOREARM and COUNTERBALANCED ROBOT ARM patents filed in the name of Flatau in September of 1982 utilized the technical diagrams prepared during and specifically for the TIGER–5 project minus the Bridgeport logo and proprietary legend. (Pl.Ex. 38, 39, 40, 41). By contrast, the drawings for the WRIST MANIPULATOR ARM were derived from work done by Flatau prior to the TIGER project. (Pl.Ex. 30).

---

**6.** None of plaintiff's three alternative non-contractual theories can be applicable here since the underlying foundation work for the manipulator technology was done over a considerable period of time long before any association between the parties. Defendants could hardly be understood to have waived or ceded their rights in the valuable REMOTE MANIPULATOR or WRIST FOR MANIPULATOR ARM technology by virtue of performance alone.

The principle case of *Lukens Steel Company v. American Locomotive Co.,* 197 F.2d 939 (2d Cir.1952) cited by plaintiff is readily distinguishable. There, the Second Circuit found that defendant was rightfully entitled to enjoy the benefit of a design it had commissioned from plaintiff even though the design incorporated an earlier patented technology of plaintiff's. The decision was grounded on a theory of equitable estoppel—the plaintiff having made no objection to the defendant's use of the design despite its knowledge of the considerable expenditures made by defendant over a period of 4½ years in preparation for production of the product.

Here, the expenditure of time and money by Bridgeport in connection with TIGER, while not insignificant, cannot serve to justify an estoppel against defendants. Unlike the plaintiff in *Lukens* Bridgeport here was aware that a legitimate dispute over the rights to the pre-existing technology existed. This was reflected in the initial letter of intent of February 10, 1981, the purchase order of March 16 as well as in the follow up correspondence sent by McCaul to Flatau in April and June of 1982. Thus, Bridgeport proceeded to make its expenditures for the CNC unit well aware of the possible risk involved.

Under the circumstances, the conclusion is inescapable that Flatau took the position he did knowing full well that he was doing so in derogation of rights he had negotiated away to Bridgeport. Perhaps the most telling indication of Flatau's state of mind at the time was his deliberate and wrongful excising of Bridgeport's proprietary legend at the time he submitted the technical drawing to his patent attorney. (Tr. 352–59)

In sum then it is abundantly clear that plaintiff, in this case, enjoys a substantial likelihood of success on the merits having established the existence of a contract granting it property rights in some of the disputed technology and defendants' attempted wrongful appropriation of it.

With respect to irreparable harm plaintiff argues that it will be deprived of valuable "lead time" if defendants are permitted to make use of themselves or disclose to other competitors the technology that is the subject of this suit. Specifically, it argues that it will be deprived of the opportunity to be one of the *initial* entrants into the field of industrial robotics—a field which will no doubt become increasingly competitive with the developing state of the art. The court agrees.

To permit defendants to wrongfully appropriate to their own use a technology which will thrust them into a competitive position they should not rightfully enjoy would inflict on plaintiff damage hardly calculable in dollars and cents. The damage would be inflicted by virtue of a ruinous competition between the parties that the contractual arrangement simply did not contemplate. To be sure, it was only contemplated that TOS would enjoy rights to *non-competitive* applications of the TIGER technology.

## CONCLUSION

In sum then, and based upon the foregoing Findings of Fact and Conclusions of Law the court is of the opinion that preliminary injunctive relief with respect to the technology developed by defendants during the TIGER project should be GRANTED.

With respect to any technology developed prior to the project but incorporated in it it is DENIED.

The parties are hereby directed to settle proposed orders of injunction with the court. The bond shall continue in effect.

The Clerk of the Court is hereby directed to serve a copy of this DECISION and ORDER on the parties.

SO ORDERED.