41 N.Y.2d 397 (1977)
Brown Bros. Electrical Contractors, Inc., Respondent,
v.
Beam Construction Corp. et al., Appellants.
Court of Appeals of the State of New York.
Argued January 5, 1977.
Decided February 24, 1977.
Richard W. Cook, Syracuse, for Cale Development Co., Inc., and another, appellants.
William V. Canale, Glens Falls, for respondent.
Chief Judge BREITEL and Judges JASEN, GABRIELLI, JONES, WACHTLER and COOKE concur.
*398 FUCHSBERG, J.
The issue in this case is whether the course of conduct and communications between plaintiff-respondent Brown and defendants-appellants Cale created a legally enforceable agreement. Trial Term found that it did and entered judgment for the plaintiff for the balance due for electrical work Brown had performed at Cale's building project. Cale now appeals from the Appellate Division's order of affirmance.
Cale was the owner and builder of Northway Shopping Plaza in the City of Glens Falls. In January, 1967, it entered into a written contract whereunder the defendant Beam became general contractor for a section of the plaza. At about the same time, Beam, in turn, subcontracted in writing with Brown for the installation of the electrical work.
Starting as early as March, Beam, though it was more than current in the receipt of moneys requisitioned by it pursuant to the terms of its agreement with Cale, was running into arrears in its own payments to Brown. As a result, Brown began to entertain such serious doubts about whether Beam would carry out its end of their agreement that it threatened in writing to claim a breach of contract unless the payments were brought up to date. True to the forebodings which *399 apparently had alarmed Brown, before the end of July, Beam found himself in such financial distress that he abandoned the job entirely. In the interim, Brown and Cale had discussed ways and means of securing payment to Brown, with the result that, when Beam departed the project, Brown, with the knowledge, consent and co-operation of Cale, nevertheless continued to perform the electrical work. He completed it by the end of August. Immediately thereafter, in early September, responding to an invoice from Brown to Cale for the amount then still due for its work on the project, Cale wrote back that it would send its check for "payment of the balance" upon receiving underwriters' inspection certificates from Brown. However, when Brown sent the certificates, Cale failed to make the promised payment, whereupon Brown initiated this litigation. Cale's position is that no new contract was entered into directly between Cale and Brown, and that Brown, in completing the electrical work, had done no more than fulfill its obligation to Beam.
Before handing down its decision for the plaintiff, the trial court, sitting without a jury, received oral as well as written evidence. In affirming the judgment, the majority at the Appellate Division found that the record confirmed the existence of a direct contract between Brown and Cale and that, in accordance with that contract, Cale was obligated to pay Brown the balance due for the electrical work up to the time of its completion. Our own examination of the proof reveals that the course of conduct between Cale and Brown, including their writings, especially taken against the continuum of events from March through September, was sufficient to spell out a binding contract between Brown and Cale independent from the one that had pre-existed between Brown and Beam. We therefore affirm.
In accordance with long-established principles, the existence of a binding contract is not dependent on the subjective intent of either Brown or Cale (Mencher v Weiss, 306 N.Y. 1, 7; Hotchkiss v National City Bank of N. Y., 200 F 287, 293 [LEARNED HAND, J.], affd 201 F 664, affd sub nom. National City Bank v Hotchkiss, 231 US 50). In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look, rather, to the objective manifestations of the intent of the parties as gathered by their expressed words and deeds (see Mencher v Weiss, supra; Homan v Earle, 53 N.Y. 267, 272). In doing so, disproportionate *400 emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain (see Arnold v Gramercy Co., 15 AD2d 762, affd 12 N.Y.2d 687; Aker v Fredella & Co., 227 App Div 226; cf. Jemzura v Jemzura, 36 N.Y.2d 496, 503-504).
Generally, the aim is a practical interpretation of the expressions of the parties to the end that there be a "realization of [their] reasonable expectations" (1 Corbin, Contracts, § 1). That principle is especially applicable here, where, at least until the litigation ensued, the actions of neither party appears to have been guided by the norms and forms of legal counsel (cf. Matter of Doughboy Inds. [Pantasote Co.], 17 AD2d 216, 219 [BREITEL, J.]).
And, while "it is the responsibility of the court to interpret written instruments (4 Williston, Contracts, § 601, supra)", where a finding of whether an intent to contract is dependent as well on other evidence from which differing inferences may be drawn, a question of fact arises (Mallad Constr. Corp. v County Fed. Sav. & Loan Assn., 32 N.Y.2d 285, 291). In the present case, each of the courts below found as a fact that the parties intended to contract. We now examine the nature of the proof to determine whether they were warranted in doing so.
Turning to that proof, we note that, though Brown's written notice in March that unless payments were brought up to date he would regard Beam as having breached his contract was made to Beam alone, it may be inferred that the problem it reflected was one which in the natural course of events caused Cale concern as well. Obviously, it raised a threat to the scheduled completion of his building project. It may also be said to have evidenced that Beam's requisitions, which other proof showed had in fact resulted in advances to it in excess of Cale's obligation, were not being rechanneled by Beam to Brown and other subcontractors in sufficient amounts to assure the expeditious progress of the construction. Indeed, by June, one of the Browns had already spoken of this problem directly by telephone to Castle, Cale's president, several times and, early that month, in a personal meeting between Castle and Brown, Castle offered to include Brown's name on Cale's future checks to Beam; immediately thereafter, that practice was put into effect. The making of this arrangement was not *401 one to which Beam was a party; it was made between Cale and Brown alone. Along with the course of events which had preceded its making, it also could form the basis of a conclusion that both Brown and Cale had become so apprehensive about Beam's financial ability to continue that they were beginning to look directly to each other. The June arrangement served both Brown's and Cale's interests. It made Brown more certain of receiving payment; it gave greater assurance to Cale that the electrical work would not be suspended and that its money would go into the job.
The extent of Brown's and Cale's reliance on one another could be found too in the fact that Brown did not exercise its right to leave the job on Beam's default. Instead, it continued performing the work, foregoing its right to treat Beam's abandonment and arrearages as a breach justifying its own departure (cf. Wharton v Winch, 140 N.Y. 287, 293-294). Cale, for its part, took over as general contractor on its own; it made no effort to substitute another in Beam's place. These events, and the earlier ones to which we have referred, suggest that Brown had by then for sometime come to regard Cale rather than Beam as its source of payment. There is strong indication that Cale joined in that expectation. For, when Brown thereafter billed Cale alone, Cale made not the slightest objection to that procedure, not even when Castle, acting in a manner that one could take to be that of one who had assumed a direct obligation to pay for the items billed, wrote Brown to object to the inclusion in the invoice of an "extra" item incurred in Beam's time. It was in that very letter that Cale wrote that it would make "payment of the balance", a phrase specifically found by the Trial Judge and the Appellate Division to have been intended to refer to all moneys due except that for the "extra" item.
This step-by-step continuum of events and permissible inferences, viewed in totality, brought the determination of whether there was an intent to contract within the realm of fact finding. The consideration for such an independent contract between Brown and Cale can easily be found in the detriment to Brown in continuing the work and the benefit to Cale in having it done (1 Corbin, Contracts, §§ 122, 124). The Appellate Division found that Brown and Cale had in fact made a direct contract by the terms of which Brown would be bound to continue to perform the electrical installations which remained undone and Cale would be bound to pay Brown all *402 sums still unpaid when the work was completed. We cannot say that there was insufficient evidence to support that finding.
Accordingly, the order should be affirmed.
Order affirmed, with costs.