**EUGENE IOVINE INC., Plaintiff,**

v.

**RUDOX ENGINE AND EQUIPMENT CO., Defendant.**

**No. CV 91–2547.**

United States District Court, E.D. New York.

Dec. 9, 1994.

Goldberg & Connolly by Norman D. Alvy, Rockville Centre, NY, for plaintiff.

Van Nostrand & Martin by David Desmond, Amityville, NY, for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

WEXLER, District Judge.

### FINDINGS OF FACT

1. In May 1984, pursuant to public bidding, plaintiff Eugene Iovine Inc. ("Iovine") was awarded a prime electrical contract by the New York City Health and Hospitals Corporation ("HHC") in the sum of $2,274,-113 to, *inter alia*, modernize the HHC Kings County Hospital (the "Hospital") electrical system from the existing direct current ("DC") system to an alternating current ("AC") system (the "HHC Electrical Contract").

2. As part of the modernization of the Hospital's electrical system, Iovine agreed to furnish and install 26 new elevator motor generator sets ("MG Set") for passenger and freight elevator service at the Hospital. The existing MG Sets consisted of a DC generator and DC motor, referred to as a DC to DC MG Set; each new MG Set was to be comprised of a DC generator and an AC motor, referred to as an AC to DC MG Set. Certain specifications for the new AC to DC MG Sets were included in the HHC Electrical Contract. Moreover, the HHC Electrical Contract required Iovine to obtain the services of a qualified elevator company as a subcontractor, to be pre-approved by HHC, for work associated with elevators, including removal of the existing DC to DC MG Sets and installation of the new AC to DC MG Sets. In that connection, the HHC Electri-

cal Contract directed that the elevator company "shall remove the existing dc motors and dc generators : . . and replace same with new ac motors and dc generators. The new equipment shall not reduce the operating speed of any of the elevators." The HHC Electrical Contract further provided that the elevator company "shall reuse, modify or replace existing controllers as required due to the motor generator set replacements. All controls shall be adjusted for proper operation of the elevators."

3. Iovine contacted defendant Rudox Engine and Equipment Co. ("Rudox") to provide a proposal for the 26 new AC to DC MG Sets. To develop a proposal, Rudox's authorized agent, Adolf Liefke ("Liefke"), visited Iovine's offices to review the applicable specifications in the HHC Electrical Contract, and inspected the jobsite.

4. Thereafter, Rudox sent Iovine a quotation, dated July 13, 1984, for 26 new AC to DC MG Sets, which included DC generators of various kilowatt power ("KW") to meet applicable performance specifications. Rudox knew that Iovine required the new MG Sets to replace the existing DC to DC MG Sets, and that the new MG Sets were required to meet applicable performance specifications of the HHC Electrical Contract. Liefke testified that Rudox determined the necessary KW ratings for the new DC generators from the nameplates on the existing DC generators at the Hospital.

5. In response to the quotation, Iovine issued Rudox a purchase order dated July 31, 1984, calling for Rudox to supply 26 new MG Sets: one 10 KW MG Set, seven 15 KW MG Sets, eleven 20 KW MG Sets, and seven 25 KW MG Sets. The purchase order contained eleven enumerated conditions. Condition 1 provides: "Supplier has examined the Specifications and Drawings applicable in the above referenced Project, and agrees that all items to be supplied by him will conform to them, and will gain Owner's timely approval." Condition 5 provides: "All warranties are to start with Owner acceptance of our completed work, and not with date of delivery of the materials."

6. By cover letter dated August 14, 1984, Rudox submitted documents to Iovine for approval of Rudox's MG Sets (the "Initial Submittal"). Iovine transmitted the Initial Submittal to HHC's engineer, Pope Engineers ("Pope"), for approval. On or about October 15, 1984, Pope approved the Initial Submittal "subject to corrections noted." These corrections, handwritten on a dimensional drawing of the MG Sets in the Initial Submittal, read: *"GENERAL COMMENTS: 1. MOTORS SHALL COMPLY WITH SPECIFICATIONS SECTION 16402 PAR. 3.13 INCLUDING ALL APPLICABLE SUB-PARAGRAPHS. 2. D.C. GENERATOR SHALL BE SUITABLE FOR ELEVATOR SERVICE."* A similar handwritten correction was noted by Pope in the Initial Submittal on a catalog cut of Kato Engineering Company ("Kato"), the eventual supplier of the DC generator: *"GENERAL COMMENTS: 1. GENERATORS SHALL BE SUITABLE FOR ELEVATOR SERVICE."*

7. By cover letter dated November 13, 1984, Rudox sent a resubmittal to Iovine for approval (the "Resubmittal"). The cover letter to the Resubmittal stated that the "D.C. Motor Generator Set will comply with specifications section 16402 PAR 3.13 including all applicable submittals [sic], with one exception, the motor will be code F instead of code D. Code F is suitable for this class of service and KATO D.C. Generator is suitable for elevator service." A "Bill of Material" included in the Resubmittal also included the above-quoted language. On December 3, 1984, Pope approved the Resubmittal. By letter dated December 11, 1984, Iovine notified Rudox of Pope's approval.

8. Following Pope's approval, Kato supplied the DC generators and Marathon Electric supplied the AC motors to William I. Horlick Co. ("Horlick") for assembly. Horlick assembled the MG Sets by in or about October 1985, and delivered them to Rudox.

9. In October 1985, Rudox made the MG Sets available for delivery, but, at Iovine's request, they were placed in storage at Rudox's facility because the jobsite was not ready for their installation. Iovine agreed to pay Rudox storage charges of $500 per month. In November 1985, Iovine paid Rudox $207,159.08 for the 26 new MG Sets in

**144**

advance of delivery to the jobsite. Iovine eventually paid Rudox a total of $13,000 for storage of the MG Sets prior to their eventual delivery to the jobsite.

10. In 1987, HHC awarded Republic Elevator Co. ("Republic") a contract to do certain upgrade work on six passenger elevators in buildings A, B, and C at the Hospital. Under its contract with HHC, Republic agreed to provide elevator "controllers" for these elevators. These six elevators were among the 26 for which Iovine had already agreed to provide new AC to DC MG Sets.

11. During January and February 1988, Rudox had the 26 new MG Sets delivered to the jobsite, with instruction manuals for their installation. Iovine, however, had not engaged the services of an elevator company as required by the HHC Electrical Contract for installation of the Rudox MG Sets. Indeed, Iovine never engaged an elevator company for installation of the Rudox MG Sets.

12. In March 1988, prior to the installation of any of the 26 new Rudox MG Sets, Republic advised HHC that the elevator controllers it would be supplying for the six passenger elevators in buildings A, B and C required 30 KW MG Sets. However, Rudox had already supplied 20 KW MG Sets for those elevators, and the largest of the MG Sets supplied by Rudox to Iovine were the seven 25 KW MG Sets. As a result, HHC sent a change order proposal for the purchase and installation of six 30 KW MG Sets for the six passenger elevators in buildings A, B, and C. Although Rudox submitted a proposal to Iovine to supply the 30 KW MG Sets, Republic was awarded the change order to supply and install the six 30 KW MG Sets.

13. In the meantime, HHC issued a change order to Iovine to install a Rudox 25 KW MG Set in building C, elevator location C-6 ("Elevator C-6"). In or about April 1988, Republic installed a Rudox 25 KW MG Set at Elevator C-6. Elevator C-6 was placed in full service with the Rudox 25 KW MG Set in or about July 1988.

14. After Elevator C-6 was put into full service, HHC experienced difficulties with Elevator C-6, including a broken coupling, inadequate speed, bypassing of floors, mislev-

eling, and bouncing. The coupling broke in or before October 1988 and was immediately replaced with a new coupling. Nevertheless, in or about October 1988, the 25 KW MG Set was removed from Elevator C-6.

15. Sometime thereafter, Republic installed the 30 KW MG Set in Elevator C-6. Despite installation of the 30 KW MG Set, HHC continued to experience difficulties with Elevator C-6, including inadequate speed and bypassing of floors.

16. By letter dated January 18, 1989 from HHC to Iovine, HHC claimed that the Rudox MG Sets "do not have the necessary elevator required characteristics," and demanded that Iovine "demonstrate that the [MG Sets] provided are suitable for elevator service and that the 25 KW MG [Set] installed for elevator C-6 be surveyed immediately, by the manufacturer, if necessary, to determine the cause of the failure of this MG [Set]." Similarly, in a letter to Pope dated December 9, 1988, HHC stated that a "review of the [Rudox MG Sets] appears to indicate that [they] are undersized and are not capable of maintaining the existing operating speed of the elevators." In response to HHC's January 18 letter, by letter dated January 25, 1989, Iovine informed HHC that it would contact Rudox to "have them do whatever tests are necessary to check into the failure of the 25 KW set." By fax dated January 31, 1989, Iovine asked Rudox to explain why the 25 KW MG Set "does not operate correctly." Subsequently, by letter dated February 6, 1989, HHC repeated its request to Iovine to demonstrate that the Rudox MG Sets are suitable for elevator service. In a letter to Iovine dated February 6, 1989, Rudox offered several comments as to the potential problems reported. Rudox also discussed the reported problems with the assembler Horlick. Nevertheless, by letter dated March 21, 1989, HHC wrote Iovine complaining of Iovine's failure to demonstrate the capability of the Rudox MG Sets, and advised that HHC "considered the [Rudox MG Sets] incompatible for elevator use, and, therefore, they are disapproved. You are directed to provide new MG sets.... A schedule is to be provided with 14 calendar days ... for procurement and installation of the required

MG [Sets]." By fax dated March 30, 1989, Iovine sent Rudox a copy of HHC's March 21 letter, and demanded to "know what you and your supplier are going to do to get these [MG Sets] to perform or buy the ones specified in [the March 21 letter]." That same day, Rudox responded by fax to Iovine indicating that "the generator manufacturer is running tests next week utilizing wiring diagrams of elevator controller ... from Republic Elevator to determine what the problems are and what is required to get this project working." Thereafter, based on, *inter alia*, meter readings from certain existing DC to DC MG Sets in building C, investigation of available information about the operation of the 25 KW MG Set, and communications with Horlick and Kato, Rudox concluded in a May 9, 1989 letter to Iovine that "[b]ased on information to date and meter readings of actual loads there is no reason why the 25 KW generator will not handle the elevator motor loads. If proper controls are provided there is also no reason the elevator system should not work properly."

17. Eventually, HHC and Iovine agreed in September 1989 to install "rectifiers" at the Hospital's elevators (except at the six elevators where Republic agreed to provide 30 KW MG Sets) rather than new MG Sets, so that the existing DC to DC MG Sets could operate when the Hospital converted from DC power to AC power, which was expected to be completed by December 31, 1989. Consequently, Iovine never installed or tested any of the remaining 25 Rudox MG Sets.

18. Iovine claims that Rudox did not adequately respond to requests from Iovine concerning purported problems with Rudox's 25 KW MG Set installed in Elevator C–6. To the contrary, the evidence, including the documentary evidence in paragraph 16, *supra*, does not demonstrate that under the circumstances Rudox failed to adequately respond to requests by Iovine for assistance in resolving alleged problems with the Rudox 25 KW MG Sets.

19. The parties offered conflicting testimony and documentary evidence as to whether the Rudox MG Sets were defective or whether they were suitable for elevator service, and whether the Rudox 25 KW MG Set installed in Elevator C–6, in particular, was defective or whether it was suitable for elevator service. Rudox's expert witness, Walter Figiel, testified that the Rudox MG Sets, including the 25 KW MG Set installed in Elevator C–6, were suitable for elevator service if they were installed properly and the elevator controllers were adjusted properly. On the other hand, Iovine relied heavily on HHC's determination that the Rudox 25 KW MG Set installed by Republic was undersized and was not capable of maintaining the existing operating speed of the elevators (*i.e.*, the speed achieved by the existing DC to DC MG Sets) and was not suitable for elevator service. In addition, Iovine's expert witness, Hubert Hayes, testified that the Rudox MG Sets were not capable of operating an elevator. However, Iovine failed to introduce evidence to demonstrate that Republic properly installed the 25 KW MG Set in Elevator C–6 and that the elevator controller operated properly and was adjusted properly. Iovine also failed to explain adequately the cause of the difficulties experienced by Elevator C–6 even with the 30 KW MG Set installed by Republic. The evidence does not demonstrate that the Rudox 25 KW MG Set installed in Elevator C–6 was defective or was not suitable for elevator service if it was installed properly and the elevator controller was adjusted properly or that the remaining 25 Rudox MG Sets were defective or were not suitable for elevator service.

### CONCLUSIONS OF LAW

1. This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332. As the parties agree, New York law governs Iovine's claims.

2. In Counts One through Four and Seven of the complaint, Iovine asserts claims against Rudox for breach of the purchase order agreement and breach of express and implied warranties. Initially, Rudox maintains that these claims are barred by the applicable statute of limitations, which the parties agree is Uniform Commercial Code § 2–725. *See* N.Y.U.C.C. § 2–725. Pursuant to § 2–725(1), an action for breach of a contract for the sale of goods must be commenced within four years from the time the

claim accrues. N.Y.U.C.C. § 2–725(1). "A sales contract is breached when nonconforming goods are delivered, regardless of whether the purchaser is aware of the breach at that time." *Long Island Lighting Co. v. Transamerica Delaval, Inc.*, 646 F.Supp. 1442, 1454 (S.D.N.Y.1986). Pursuant to § 2–725(2), an action for breach of warranty must be commenced within four years from "tender of delivery." N.Y.U.C.C. § 2–725(2). The limitations period begins to run "when the seller tenders delivery of defective goods, unless the warranty expressly extends to future performance." *City of New York v. Pullman Inc.*, 662 F.2d 910, 919 (2d Cir. 1981), *cert. denied sub nom. Rockwell Int'l Corp. v. City of New York*, 454 U.S. 1164, 102 S.Ct. 1038, 71 L.Ed.2d 320 (1982); *see also H. Sand & Co. v. Airtemp Corp.*, 934 F.2d 450, 455 (2d Cir.1991).

■ Rudox contends that the four year limitations period for Iovine's breach of contract and warranty claims began running in October 1985 when the MG Sets were made available for delivery to Iovine. Because this action was commenced on July 12, 1991, Rudox argues that these claims are time-barred. Iovine, on the other hand, contends that the limitations period began to run, at the earliest, in January or February 1988, when the MG Sets were delivered to the jobsite for installation. Alternatively, Iovine contends that Condition 5 of the purchase order constitutes "a warranty explicitly extending to future performance," and demonstrates that Rudox's warranties would commence not at date of delivery, but at a future date upon acceptance of Iovine's work by HHC.

Upon consideration of the evidence, this Court finds that—for purposes of § 2–725(1)—the statute of limitations began to run in October 1985 when Rudox tendered delivery of the MG Sets to Iovine and agreed to store them at its facility, at Iovine's request and expense, because the jobsite was not readied for their installation, *see* N.Y.U.C.C. § 2–503. Accordingly, Iovine's

breach of contract claim, Count One, is time-barred.

■ However, Iovine's breach of warranty claims are not time-barred. Condition 5 of the purchase order clearly establishes the parties' intent that, for purposes of § 2–725(2), "tender of delivery" would occur not upon delivery of the MG Sets, but upon HHC's acceptance of Iovine's work. Consequently, the four year statute of limitations on "all warranties" could not have expired by July 12, 1991, the date this action was commenced as the MG Sets were not even delivered to the jobsite for installation until January and February 1988. Accordingly, Iovine's breach of warranty claims are not time-barred.

■ Nevertheless, upon considering all of the evidence, Iovine failed to prove that the Rudox 25 KW MG Set installed in Elevator C–6 was defective or was not suitable for elevator service if installed properly and the elevator controller adjusted properly or that the remaining 25 Rudox MG Sets were defective or were not suitable for elevator service. Particularly significant is Iovine's failure to demonstrate that Republic properly installed the 25 KW MG Set in Elevator C–6 and that the elevator controller was adjusted properly and operated properly. Also significant is Iovine's failure to explain adequately the cause of the difficulties experienced by Elevator C–6 with the 30 KW MG Set installed, particularly since these difficulties were similar to those complained of during installation of the Rudox 25 KW MG Set.[1] Accordingly, Counts Two through Four and Seven are dismissed.[2]

■ 3. In Count Six, Iovine purportedly asserts that Rudox's breaches resulted from Rudox's negligence. Under New York law, a party may not maintain a claim for negligence if the purported claim is merely a claim for breach of contract; rather, the party must allege, and ultimately prove, the violation of a duty independent of the contract. *See Clark–Fitzpatrick, Inc. v. Long*

---

**1.** Even assuming Count One is not barred by the statute of limitations, the Court also finds that Iovine has failed to establish a breach of the purchase order agreement.

**2.** Based on this conclusion, the Court need not determine the merits of Rudox's remaining arguments.

 

*Island R.R.,* 70 N.Y.2d 382, 521 N.Y.S.2d 653, 656–57, 516 N.E.2d 190, 193–94 (1987). Because Count Six is merely a restatement of Iovine's claims alleging breach of contractual obligations, this count must be dismissed. Accordingly, Count Six is dismissed.[3]

■ 4. In Count Five, Iovine asserts a claim for fraudulent inducement in entering the purchase order agreement. Specifically, Iovine claims that Rudox fraudulently represented that the Rudox MG Sets were suitable for elevator service, thereby inducing Iovine to enter the purchase order agreement. A claim based on fraud in the inducement will lie where the alleged fraudulent statements are representations of present fact, but not where they are merely promissory statements as to what will be done in the future. *Stewart v. Jackson & Nash,* 976 F.2d 86, 88–89 (2d Cir.1992). The fraudulent representations alleged are not representations of present fact but promissory statements as to what will be done in the future. In any event, even assuming that the alleged representations were representations of present fact, Iovine's fraud claim fails because Iovine failed to establish that the MG Sets were not suitable for elevator service. Accordingly, Count Five is dismissed.

■ 5. In Count Eight, Iovine purports to assert a separate claim for punitive damages based on Rudox's allegedly fraudulent inducement of the purchase order agreement. A party may not maintain a separate claim for punitive damages; where punitive damages may properly be awarded, they may properly be demanded as a form of relief, and a separate claim for punitive damages should be deemed a request for this relief. *Fletcher v. Atex, Inc.,* No. 92 Civ. 8758, 1993 WL 97321, slip op. at 2 (S.D.N.Y. March 30, 1993); *Goldberg v. New York Times,* 66 A.D.2d 718, 411 N.Y.S.2d 294, 295 (1st Dep't 1978). Nevertheless, because all of Iovine's claims are dismissed, there is no basis for an award of punitive damages.

6. Based on the foregoing, the Clerk of the Court is directed to enter judgment against plaintiff Iovine and in favor of defendant Rudox on all of Iovine's claims.

SO ORDERED.

---

**3.** To the extent that Count Seven purports to allege negligent breach of contract, that count must be dismissed on this ground as well. *See*

*Clark–Fitzpatrick, Inc.,* 521 N.Y.S.2d at 656–57, 516 N.E.2d at 193–94.