**Eunice KENYON and Robert Kenyon, Plaintiffs,**

v.

**Abner DELMAN, M.D., Defendant.**

**No. 96–CV–709 LEK RWS.**

United States District Court,
N.D. New York.

Dec. 23, 1998.

Grasso, Rodriguez, Grasso & Zyra, Schenectady, NY (Lawrence J. Zyra, of counsel), for Plaintiffs.

Bouck, Holloway, Kiernan & Casey, Albany, NY (John R. Casey, of counsel), for Defendant.

### MEMORANDUM–DECISION AND ORDER

KAHN, District Judge.

Plaintiffs bring this action in connection with Defendant's failure to testify at trial in support of a medical report prepared by the Defendant. Plaintiffs allege three claims: breach of contract, negligence and fraud. Originally, they brought their action in New York State Supreme Court. On May 3, 1996, Defendant removed it to federal court on the basis of diversity jurisdiction, and now moves for summary judgment, or in the alternative for leave to file a third-party complaint. For the reasons discussed below, Defendant's motion for summary judgment is granted on all claims.

### I. Facts

Plaintiff Eunice Kenyon ("Mrs.Kenyon") suffered a heart attack while under the care of Dr. Robert Kemp ("Dr.Kemp"), and contemplated bringing a lawsuit against him. Plaintiff's attorneys, Grasso, Rodriguez, Putorti & Grasso ("the Grasso law firm"), contacted Medical Review Associates, Inc. ("MRA"), a New York corporation, for the purpose of determining whether there was a valid medical malpractice claim against Dr. Kemp. MRA is a firm in the business of reviewing potential medical malpractice claims and obtaining expert opinions on their merit. The review process involves MRA giving a file they receive to one of their three to four hundred board certified experts. Files are given to a particular physician based on the physician's area of expertise. The expert then submits an opinion to MRA which is passed on to the client.

Defendant Dr. Abner Delman ("Dr.Delman"), was one of the board certified physicians retained by MRA. It is undisputed that at no time did MRA and Dr. Delman have a written contract. Dr. Delman's agreement to render services came about as a result of a conversation between Allen Bloomberg, M.D. ("Dr.Bloomberg"), the Director of MRA and Dr. Delman as to whether the Defendant would be interested in becoming a consultant for the group. Dr. Delman agreed, and they orally established the compensation terms of the agreement. Under the agreed terms, compensation would be given for each case Dr. Delman reviewed, but MRA was not obligated to send him any cases. Between 1986 and 1992, the Defendant reviewed 98 cases for MRA. In six cases, he testified at trial in support of his report and until 1993, never refused to provide such live testimony.

In December of 1989, the Plaintiffs provided MRA with various medical records and other information relating to Dr. Kemp's treatment of Mrs. Kenyon. In February of 1990, MRA passed the file on to the Defendant who reviewed it and concluded that Dr. Kemp's treatment of Mrs. Kenyon deviated from accepted medical standards. The Grasso law firm tendered $950 to MRA for the review of the file and Defendant's report. MRA retained $200 of the $950 and paid Defendant the remaining $750. At no time did Mrs. Kenyon's attorneys, the Grasso Law firm, communicate with Dr. Delman. Based on Dr. Delman's report, the Plaintiffs commenced a medical malpractice action against Dr. Kemp on March 14, 1990 in Supreme Court, Montgomery County, New York.

Prior to 1991, Dr. Delman maintained residences in both New York and New Mexico. In 1991, Dr. Delman gave up his New York residence and moved permanently to Sante Fe, New Mexico with his wife. Despite giving up his New York residence, he returned to New York on three occasions thereafter to testify in cases in which he had rendered an opinion for MRA. However, in the summer or fall of 1993, Defendant made a decision that he no longer wanted to fly to New York to appear live for trial testimony, allegedly because of his wife's health. He informed MRA of his decision and offered to have his testimony videotaped in New Mexico if needed or to have a colleague, Dr. Jack Goldberg ("Dr.Goldberg"), testify in his place.

In late April of 1993, before Dr. Delman's decision not to return to New York to testify, the Grasso law firm sent a letter to MRA inquiring as to the availability of Dr. Delman to testify at the trial in early December. At some time in early November, MRA notified the Grasso law firm that Dr. Delman would not be available for the December trial. No reason was provided by MRA regarding why defendant was not available nor was there any reference as to whether the unavailability was temporary or permanent. On November 8, 1993, the Grasso law firm requested and was granted an adjournment by the trial judge.

At a conference held on March 7, 1994, the trial was scheduled for April 25, 1994. A week later, the Grasso law firm contacted Dr. Bloomberg and was informed that Dr. Delman now lived in New Mexico and that Dr. Bloomberg would get back to them regarding the availability of Dr. Delman for testimony. At some time subsequent, Dr. Bloomberg contacted Dr. Delman, who repeated that he would not travel to New York to testify at trial and suggested again that his deposition could be videotaped in Sante Fe or alternatively that substitute testimony could be provided by Dr. Goldberg. By a letter dated April 18, 1994 the Grasso law firm was notified by MRA that Dr. Delman would not be available to testify at the trial due to the distance and his wife's ill health. Plaintiffs assert that the Grasso law firm was not notified that Dr. Delman was willing to have a deposition videotaped.

The Plaintiffs settled their medical malpractice action against Dr. Kemp for $200,-

000. This was agreed to without any efforts to contact Dr. Delman directly, to videotape him in New Mexico, to take his deposition via satellite, or to ask for a substitute expert.

Plaintiffs subsequently brought this suit against Dr. Delman claiming that they had been damaged by his unavailability to testify because they were forced to settle the suit for less than it was worth. Damages are sought under three theories of liability: (1) Breach of Contract, based on Plaintiffs' rights as third-party beneficiaries; (2) Negligence; and (3) Fraud.

## II. Discussion

### A. Standard of Review

Summary Judgment must be granted when the pleadings, depositions, answers to interrogatories, and affidavits show that there is no genuine issue as to any material fact, and that the moving party is entitled to summary judgment as a matter of law. Fed.R.Civ.P. 56; *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Lang v. Retirement Living Pub. Co.,* 949 F.2d 576, 580 (2d Cir.1991). The burden is upon the moving party to demonstrate an absence of a genuine issue of fact. Fed.R.Civ.P. 56; *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990). When determining whether a genuine issue of fact exists, facts, inferences therefrom, and ambiguities must be viewed in a light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Project Release v. Prevost,* 722 F.2d 960, 968 (2d Cir.1983).

If the movant has demonstrated that no genuine issue of fact exists, the non-moving party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56; *Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348. To withstand a summary judgment motion, sufficient evidence must exist upon which a reasonable jury could return a verdict for the nonmovant. *Liberty Lobby, Inc.,* 477 U.S. at 248–49, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co.,* 475 U.S. at 587, 106 S.Ct. 1348.

### B. Breach of Contract

Defendant argues that summary judgment should be granted on the breach of contract claim because there was no contract between him and MRA requiring him to testify at trial, or in the alternative, because he did not breach any agreement.

"In determining whether the parties entered into a contractual agreement and what were its terms, it is necessary to look . . . to the objective manifestations of intent of the parties as gathered by their expressed words and deeds." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.,* 41 N.Y.2d 397, 399, 393 N.Y.S.2d 350, 361 N.E.2d 999 (1977). Thus, although terms of a contract are enforceable only if there is a mutual intent to be bound to those terms, *see Four Seasons Hotels Ltd. v. Vinnik,* 127 A.D.2d 310, 515 N.Y.S.2d 1, 5 (N.Y.App.Div.1987), the Court looks not to the subjective intent of the parties but the intent that is evident from their objective actions and statements. *Lehrer McGovern Bovis, Inc. v. New York Yankees,* 207 A.D.2d 256, 615 N.Y.S.2d 31, 34 (N.Y.App.Div.1994). The determination must be made by considering the totality of all words and acts given the attendant circumstances, the situation of the parties and the objectives they were striving to attain. *Brown Bros., id.* at 400, 361 N.E.2d 999. The goal of this approach is to achieve a practical interpretation of the expressions of the parties to the end that there be a realization of the parties' reasonable expectations. *Id.* The determination of intent, and therefore whether a contract exists, "should not be resolved as a matter of law when it depends on a choice among reasonable inferences." *Id.* (citation and internal quotations omitted).

In this case, there is no dispute regarding the existence of a contract to review malpractice files and then submit a report. However, whether there was a concomitant promise to testify at a trial in the event of a finding of malpractice if needed is disputed. Plaintiffs point to the testimony of the two principle employees of MRA, Dr. Bloomberg, the Director, and Paul Bloomberg, the Assistant Director. Dr. Bloomberg testified that "if there is a positive report, and there is reason to believe that [there is] merit to the client's allegations, that [the doctor] would be prepared to testify." Zyra Aff.Exh. 3 at 9. When asked if he had ever discussed that specifically with Dr. Delman, he answered: "Yes, more than likely, because I never took anybody on to review that I hadn't discussed that with." *Id.*

Dr. Delman remembered the conversation more specifically:

In that first conversation, Dr. Bloomberg asked me, "in principle, would you have any problem with testifying if a case that you reviewed came to trial; would you object to testifying against another doctor?" and I told him no, and, "In principle, I'll have no problem with this," and I said, "If I review a case and I think there's a substantial deviation and I write a letter to that effect, in principle, I will have no problem in testifying," and, in actuality, that's the only thing that ever got discussed.

Zyra Aff.Exh. 1 at 21.

Paul Bloomberg testified that there was an "oral agreement" with the Defendant: "If a doctor or if Dr. Delman gave a positive finding in the case, we expected Dr. Delman to testify at trial or deposition as needed." Zyra Aff.Exh. 2 at 11. However, although Paul Bloomberg referred to this as an "oral agreement," it is not apparent what he meant by the term since, when asked immediately after this statement if he had discussed that expectation with Dr. Delman, he responded, "I don't recall." *Id.* It appears that he was refer-ring to Dr. Delman's conversation with Dr. Bloomberg.

Plaintiffs also point to the undisputed fact that out of 100 cases on which the Defendant worked, he was called upon to testify in six and did so testify. Further, even after he moved to New Mexico in 1991, he returned to New York on three occasions to testify in trials in support of his medical reports.

From Dr. Delman's agreement to testify "in principle" combined with the subsequent course of conduct a reasonable inference might be drawn that the parties understood that some form of testimony would be provided. However, the Court finds that no reasonable trier-of-fact could conclude from the objective words and actions of the parties and their reasonable expectations that there was a mutual intent that Dr. Delman would be bound to testify live at trial. Rather, the conduct of the parties demonstrates that both parties to the agreement accepted alternatives such as videotaped testimony or substitute testimony.

Plaintiffs do not offer any statement from an MRA employee to the Defendant that he *must* testify at trial in every instance. In Dr. Delman's recollection of conversation between him and Dr. Goldberg, a version which is not disputed by Dr. Goldberg, Dr. Delman was asked only if he would not object to testifying; he was not told that he would always be obligated to testify, much less that he would always be obligated to testify live at trial. Further, there is no evidence in the record that MRA objected at any time to the Defendant's refusal to testify live. Dr. Delman testified that Paul Bloomberg called him twice to ask him to testify in other cases: "both times, I told him, 'No. Call Jack Goldberg.' I told him that both times. He said, 'Okay.'" Zyra Aff.Exh. 1 at 65. Thus, MRA not only did not object, but in these instances, verbally and affirmatively accepted Dr. Delman's position. Again, when Dr. Bloomberg called Dr. Delman concerning the Kenyon case and

Dr. Delman informed him again that he didn't want to leave New Mexico, Dr. Bloomberg, according to his own testimony, contacted the Grasso law firm and "offered a substitute, Dr. Jack Goldberg." He also allegedly suggested the possibility of a videotaped deposition. *Id.* at 12. It is also undisputed that MRA had offered these alternatives to their clients on previous occasions. Zyra Aff.Exh. 2 at 39. Thus, the objective words and deeds of the parties do not support a reasonable inference that there was a mutual intent that Dr. Delman would be obligated to testify live at every trial. The Court also finds that allowing for alternatives to live testimony would not defeat the reasonable expectations of MRA or their clients since the alternatives would still provide the necessary evidentiary support for the medical analysis at trial. Indeed, even one of the Plaintiffs' attorneys conceded that videotaped testimony would have been sufficient. Zyra Aff.Exh. 4 at 56. In sum, the Court finds that the most that a reasonable trier-of-fact could conclude is that Dr. Delman had an obligation to provide some form of testimony which might include alternatives to live testimony at trial such as a videotaped deposition or substitute expert witness.

Assuming such an obligation, there is no evidence that Dr. Delman breached his contractual obligations. Without determining who was at fault for the Grasso law firm's failure to pursue the alternatives of a video-taped deposition or substitute witness, the Court finds that the blame is not due to any action by Dr. Delman. He never refused any request to make such arrangements, and in fact affirmatively brought up the alternative arrangements at every instance in which his testimony was requested by MRA. Thus, the record does not support the conclusion that he breached his contract with MRA, and summary judgment is therefore granted to the Defendant on this claim.

## C. Negligence

■ Plaintiffs assert that Defendant was negligent in his dealings with the Plaintiffs and that he negligently failed and refused to provide testimony. A plaintiff may sue in tort under the negligence theory of liability where the conduct alleged breaches a legal duty which exists "independent of contractual relations between the parties." *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir. 1980). A party must allege, and ultimately prove, the violation of a duty independent of the contract and may not maintain a claim for negligence if the claim is merely a breach of contract claim. *Eugene Iovine Inc. v. Rudox Engine and Equip.*, 871 F.Supp. 141, 146 (E.D.N.Y.1994). "If the only interest at stake is that of holding the defendant to a promise, the courts have said that the plaintiff may not transmogrify the contract claim into one for tort." *Hargrave*, 636 F.2d at 899.

■ Thus, the issue in this case is whether Dr. Delman had a duty to testify that was independent of any contractual duty. There is no New York case law which establishes that a physician has a duty to testify. Other state courts have reached somewhat conflicting outcomes. *Compare Spaulding v. Hussain*, 229 N.J.Super. 430, 551 A.2d 1022 (N.J.Super.Ct.App.Div.1988) (finding that a treating physician has a "duty to testify as part of his duty to treat his patient....") *with Knight v. Johnson*, 237 Mont. 230, 233, 773 P.2d 293 (Mont.1989) ("no duty exists for a physician to testify at the trial of a patient, absent compulsory process."). However, even if this Court were to adopt the view of *Spaulding*, the duty would clearly be inapplicable here, where the Defendant was not a treating physician and accordingly had no duty to treat Mrs. Kenyon. Further, *Spaulding* did not go so far as to hold that even a treating physician has a duty which "invariably requires the physician to testify in court...." *Id.* at 440, 551 A.2d 1022. Rather, it stated that the doctor "may, in the particular circumstances,

be able to fulfill his duty to render litigation assistance ... by submitting to videotaped depositions...." *Id.* Here, Defendant was willing to do so. Thus, summary judgment on the negligence claim is granted to the Defendant.

### D. Fraud

■ This claim is not discussed by the parties. However, in the Plaintiffs' complaint, they assert that "[o]n or about February 1990, and subsequent thereto, the defendant and/or his agents made certain false, fraudulent and untrue statements to the plaintiffs and/or their agents." Compl. ¶ 9. Because the undisputed record demonstrates that, prior to this litigation, Defendant never spoke to either the Plaintiffs or the Grasso law firm, the Court assumes that the reference to Plaintiffs' "agents" in the complaint is intended to mean MRA, and that the alleged fraudulent statements are those made by Dr. Delman to MRA employees. Although Plaintiffs are third-parties to any statements between Defendant and MRA, "[a] third-party can recover damages for fraudulent misrepresentation if he can establish that he relied upon it to his detriment, and that the defendants intended the misrepresentation to be conveyed to him." *Rosen v. Spanierman,* 894 F.2d 28, 33 (2d Cir.1990) (citations and internal quotations omitted).

■ Viewed as alleging this sort of claim, the allegation in the complaint is deficient as a matter of pleading. Pursuant to Fed.R.Civ.P. 9(b), fraud must be pleaded with "particularity." Under this higher pleading standard, the "complaint must adequately specify the statements it claims were false or misleading, give particulars as to the respect in which plaintiffs contend the statements were fraudulent, state when and where the statements were made, and identify those responsible for the statements." *Cosmas v. Hassett,* 886 F.2d 8, 11 (2d Cir.1989). Plaintiffs' allegation is clearly insufficient to satisfy this standard.

As Defendant's motion is seeking summary judgment, the Court may consider the affidavits and other evidence filed by the Plaintiffs in assessing whether their allegations are sufficient to state a claim for fraud. *See Connors v. Hallmark & Son Coal Co.,* 935 F.2d 336, 344 (D.C.Cir. 1991). However, the full record still does not make clear what specific statements made by Defendant the Plaintiffs are referring to that were fraudulent, were conveyed to them and on which they relied to their detriment. Because of this insufficiency, summary judgment must be granted to the Defendant.

Accordingly, it is hereby

ORDERED that Defendant's motion for summary judgment is GRANTED, and the action is DISMISSED in its entirety; and it is further

ORDERED that the Clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.