## IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF: WEEKAPAUG GROOVE LLC, a Delaware limited liability company, | ) ) ) ) | |
| and | ) ) | C.A. No. 12012-VCL |
| SEAN AVERY, individually and derivatively on behalf of Weekapaug Groove LLC, a Delaware limited liability company, | ) ) ) ) ) | |
| Counterclaim Plaintiff, | ) ) ) | |
| v. | ) ) | |
| CHARLES GALLANTI, INC., a New York corporation, | ) ) ) | |
| Counterclaim Defendant. | ) ) | |

## POST-TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Respondent Weekapaug Groove LLC (the "Company") is a dissolved Delaware limited liability company with two members: counterclaim-plaintiff Sean Avery and counterclaim-defendant Charles Gallanti, Inc. ("CGI"). The Company's operating business has been wound up. This order makes post-trial findings of fact and reaches conclusions of law that address (i) certain litigation assets of the Company that the parties have asserted as derivative claims in this proceeding, (ii) a disputed liability that CGI asserted as a creditor, and (iii) the proper distribution of the Company's cash.

2.      The evidence at trial supported the following findings of fact:

        a.      CGI is a successful building contractor in the New York area. After Charles Gallanti, the eponymous principal of CGI, worked on a vacation home that Avery

owned, the two men became friendly and discussed going into business flipping houses. CGI would provide the construction and renovation services. Avery would provide the bulk of the capital. Over the long run, Avery would learn about construction from Gallanti.

b. In October 2014, Avery and CGI formed the Company. Through the Company, they entered into an agreement to purchase a single-family home in Southampton, New York (the "Property"), which they planned to renovate and sell.

c. Contemporaneously, Avery and CGI entered into an oral agreement regarding the renovation process (the "Renovation Agreement"). Under the Renovation Agreement, CGI agreed to provide, at cost, the labor and materials needed to renovate the Property. In exchange, Avery agreed to contribute to the Company all of the funds necessary to pay CGI for the renovations.

d. The initial construction budget contemplated a total project cost of $647,439. Avery understood that the initial budget was not a guaranteed maximum price. He also understood that the actual cost could change due to multiple factors and that it likely would change if there were modifications to the renovations.

e. As work progressed, Avery and Gallanti worked collaboratively on the project. Avery was closely involved and approved changes to the renovations.

f. During the course of the project, CGI informed Avery of increases to the total project cost through invoices and revised budgets. In doing so, CGI operated in its ordinary course of business and followed the same procedure it uses with all clients.

g. On August 31, 2015, CGI submitted a draft final invoice in the amount of $114,963.67. At the time, CGI had not received all of the invoices it expected to receive

2

from subcontractors and suppliers. The August 2015 invoice estimated the total project cost at $738,727.86. Avery refused to pay the invoice. Before this point, Avery had paid all of CGI's invoices without objection.

h.      On December 30, 2015, CGI sent a revised final invoice that increased the amount sought to $190,481.52 (the "Final Invoice"). With this increase, the total project cost rose to $746,655.53. Avery continued to refuse to pay.

i.      In February 2016, CGI filed this action. CGI sought dissolution of the Company on grounds of deadlock and the appointment of a liquidating trustee. Avery opposed dissolution and asserted counterclaims against CGI. The existence of a deadlock was readily apparent. Among other things, although the renovations were complete, the parties were unable to agree how to manage, sell, or maintain the Property. Because the deadlock jeopardized the value of the Property, I appointed a trustee *pendente lite* to manage the Property, sell it, and hold the proceeds in escrow pending the outcome of the parties' disputes. Dkt. 24.

j.      The trustee carried out his charge. As of April 8, 2019, the trustee held $1,526,108.41 in escrow. The Company's operating account held another $7,110.90.

3.      The Company has litigation assets in the form of derivative claims that the parties have asserted on CGI's behalf. The first four derivative claims, which Avery asserted against CGI, lack merit. One other derivative claim, which CGI asserted against Avery, has merit.

a.      In the first derivative claim, Avery contends that CGI breached its fiduciary duties by overcharging the Company for labor. Through this claim, Avery recasts

3

his objection to CGI's breach of contract claim as a fiduciary duty theory. The core dispute is over whether CGI overcharged for labor under the Renovation Agreement. That issue is properly addressed when adjudicating CGI's claim for payment of its invoice. The breach of fiduciary duty theory rises or falls with the breach of contract claim. In light of the disposition of the breach of contract claim, this issue is moot.

b. In the second derivative claim, Avery contends that CGI breached its fiduciary duties by exceeding the initial budget. This claim fails.

i. As a threshold matter, CGI was not obligated to stick to the initial budget. That budget was an estimate, and Avery understood that it could and would change. In particular, it changed when the scope of the project changed. Avery participated with CGI in making changes to the scope of the project that resulted in the costs going up. He cannot blame CGI for performing the work that Avery and CGI decided upon.

ii. Within the parameters of the project, CGI had some discretion about how much work to perform. In theory, if CGI was profiting from the work, then CGI could have acted selfishly by performing unnecessary work and getting the profit. Under the Renovation Agreement, however, CGI was obligated to perform the work at cost.

iii. Because of the at-cost arrangement, CGI's interests were aligned with Avery's. CGI only would receive a return if the Company generated a profit. The business judgment rule therefore applies to CGI's decisions about how much work to perform. *See Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *16 (Del. Ch. Mar. 7, 1991). Avery failed to rebut the protections of the business judgment rule.

4

c.      In the third derivative claim, Avery contends that CGI breached Section 5.2 of the operating agreement by charging the Company for expenses that Avery did not approve. Section 5.2 requires that Avery and CGI jointly approve reimbursement requests "for any direct out-of-pocket expenses incurred in managing the Company." JX 3 § 5.2. CGI never sought reimbursement for management expenses. CGI charged the Company under the Renovation Agreement for expenses incurred for the Property. Section 5.2 does not apply.

d.      In the fourth derivative claim, Avery contends that CGI breached an implied covenant in section 5.2 of the operating agreement by failing to provide documentation for its expenses in the time-frame Avery demanded. Because section 5.2 does not apply, there is no gap to fill.

e.      CGI asserts in its derivative claim that Avery failed to account to the Company for revenue he received. Between March and August 2016, Avery rented the Property through Airbnb. He received $34,920 in rental income. He turned over to the Company only $22,495.79. Avery kept the rest, purportedly to cover expenses he paid on behalf of the Company. Avery failed to provide sufficient documentation to support these expenses. Avery is liable to the Company for $12,424.21. As discussed below, this order does not require Avery to make an out-of-pocket payment. This order addresses Avery's liability to the Company by directing the trustee to make an initial distribution of $2,420.24 to CGI, representing CGI's share of the recovery.

4.      When winding up the affairs of a Delaware limited liability company, assets are first used to satisfy the company's creditors. 6 *Del. C.* § 18-804(a)(1). CGI claims to

5

be a creditor of the Company with a contractual claim for the Final Invoice. Avery disputes the amount of the invoice.

   a. CGI issued the invoice under the Renovation Agreement, which is an unwritten agreement governed by New York law. *See Restatement (Second) of Conflict of Laws* § 188(1) & (2) (Am. Law. Inst. 1971). Under New York law, "[t]he fundamental, neutral precept of contract interpretation is that agreements are construed in accord with the parties' intent." *Greenfield v. Philles Records, Inc.*, 780 N.E.2d 562, 569 (N.Y. 2002). Parties demonstrate intent through their objective manifestations. "Disproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Brown Bros. Elec. Contractors, Inc. v. Beam Constr. Corp.*, 361 N.E.2d 999, 1001 (N.Y. 1977).

   b. Avery asserts that the initial budget of $650,000 capped the amount of expenses that CGI could incur under the Renovation Agreement. The evidence at trial proved otherwise. The initial budget was an estimate. During the period of performance, CGI submitted budgets and invoices that gradually increased the estimated cost of the project. Until the draft final invoice, Avery did not object to the increases. Instead, he contributed funds to the Company to pay the invoices. There was no cap.

   c. Avery also asserts that the Final Invoice is too high because the Renovation Agreement called for CGI to provide labor "at cost." CGI contends that in lieu of a per-laborer cost, the parties agreed on a flat rate of $35 per hour per laborer. Avery's position was more persuasive. The parties agreed that CGI would provide labor and

6

materials at CGI's cost, which for labor meant CGI's actual cost, not a flat rate of $35 per hour across the board.

    d.    The records show that CGI paid its employees at varying rates. Only the most skilled employees received $35 per hour; others received less. *See* JX 18; JX 20; JX 54. In addition, CGI paid Gallanti's brother for providing overhead services, but under the structure of the parties' deal, CGI was providing those services for free in return for its equity upside. In total, CGI charged $35,455.10 more than its actual cost. *Compare* JX 14, *with* JX 18. Deducting this amount from the final invoice of $190,481.52 leaves a net amount of $155,026.42.

    e.    CGI is entitled to recover $155,026.42 as a creditor of the Company. CGI requested pre-judgment interest on this amount due. "[P]rejudgment interest is governed by the substantive law of the state where the contract was to be performed." *Cooper v. Ross & Roberts, Inc.*, 505 A.2d 1305, 1306 (Del. Super. 1986). Under New York Law, "Interest shall be recovered upon a sum awarded because of a breach of performance of a contract . . . ." N.Y. C.P.L.R. § 5001(a) (McKinney). The New York statutory interest rate is an annual simple rate of 9%. *Id.* § 5004. "Interest shall be computed from the earliest ascertainable date the cause of action existed . . . ." *Id.* § 5001(b). CGI's invoices did not set a payment deadline, but thirty days after submission of an invoice is a reasonable amount of time in which to provide payment. Therefore, pre-judgment interest on the $114,963.67 demanded in the fourth invoice ran from September 30, 2015. Interest on the remaining $40,062.75 ran from January 29, 2016.

f.       The amount of interest as of the date of this order is $48,277.34. CGI's total claim, inclusive of interest, is $203,303.76.

5.       After satisfying the claims of creditors, unless the operating agreement provides otherwise, the remaining assets of the Company are next distributed to the members to pay back their capital contributions. 6 *Del. C.* § 18-804(a)(3). The Company's operating agreement does not provide otherwise.

a.       CGI's sole contribution to the Company was $300,000. *See* Gallanti Dep. 144.

b.       Avery contributed $1,240,000 and withdrew $20,000. *See* JX 7. At trial, the witnesses agreed that Avery's $20,000 withdrawal was used for Company-related expenses. *See* Gallanti Tr. 257–58; Avery Tr. 27. Therefore, the amount will not be deducted from Avery's total contributions.

c.       The Company has total available cash of $1,533,219.31. After paying CGI's creditor claim of $203,303.76, the remaining amount is $1,329,915.55. This amount is insufficient to return all of the members' capital contributions.

6.       When there are insufficient funds available to repay members' capital contributions, distributions are made to the members "ratably to the extent of assets available." 6 *Del. C.* § 18-804(b).

a.       The ratable proportion makes a big difference. CGI argues that the Company's operating agreement specified the rate of distributions at 60% for Avery and 40% for CGI. If the distributions are made as CGI requests, then Avery would receive back 64.3% of his capital or $797,949.33 and CGI would receive back 177.3% of its capital or

8

$531,966.22. Alternatively, if the distributions are made in proportion to the amount of total cash capital contributions that each member contributed, then Avery would receive 80.52% of the amount available or $1,070,848.00 and CGI would receive 19.48% of the amount available or $259,067.55. Each would end up receiving back 86.4% of the capital that they invested.

b.      The operating agreement in this case is not well drafted. It described the Company as a "MULTI MEMBER MANAGED LIMITED LIABILITY COMPANY" and established a governance structure with a single managing member. But in a schedule titled "MEMBERSHIP LISTING," the agreement identified both Avery and CGI as managing members. It accomplished this by creating two classes of members, defined as (i) "Class A Members (Managing Member)," with "All Voting Rights and Equity Shares" and (ii) "Class B Members" with "No Voting Rights and Equity Shares." Under the heading for Class A Members, it listed both Avery and CGI. The schedule then distinguished between their "Voting %" and "Equity %." Voting rights were divided 50/50 between Avery and CGI. The equity percentage was split 60/40, with Avery receiving 60% and CGI 40%.

c.      Notwithstanding the fixed allocation of voting rights and equity percentages, other sections of the operating agreement spoke in terms of capital accounts. Section 3.1 of the agreement, titled "PROFITS/LOSSES," stated that "[f]or financial accounting and tax purposes, the Company's net profits or net losses . . . shall be allocated to the Members in proportion to each Member's relative capital interest in the Company as set forth in Exhibit 2 as amended from time to time." JX 3 § 3.1. Although there was no

9

Exhibit 2, this provision nevertheless contemplated allocations in accordance with capital contributions. Section 3.2 of the agreement entitled "DISTRIBUTIONS," likewise contemplated that "[d]istributions in liquidation . . . shall be made in accordance with the positive capital account balances" of the members. *Id.* § 3.2.

   d.  Read together, the provisions of the operating agreement call for returning capital contributions in proportion to the amount of cash capital invested, then paying out any profits at the 60/40 rate. Avery testified that this was the agreement. Avery Tr. 13–21. During his deposition and on cross examination, Gallanti agreed. *See* Gallanti Tr. 219; Gallanti Dep. 137.

   e.  CGI has claimed that the 60/40 split recognized that CGI contributed capital in the form of "sweat equity" and was forgoing its usual contractor fee of 15%. CGI argues that it would be unfair not to value CGI's non-cash contributions. But the operating agreement did not list a non-cash capital contribution for CGI or place any value on it. Moreover, because Avery contributed far more cash, the 60/40 split would result in disproportionate results in downside situations. If this was what the parties intended, then they needed to contract for it explicitly.

   f.  The 60/40 split referred to profits. For purposes of return of capital, distributions are made ratably in proportion to cash contributed. Under this method, Avery receives 80.52% of the Company's remaining assets and CGI receives 19.48%.

   7.  The percentages for returning capital ratably can be used to adjust the payouts for the $12,424.21 that Avery owes the Company for the outstanding Airbnb revenue. If Avery repaid this amount to the Company, then it would be distributed to the members as

10

part of their return of capital. Under that approach, Avery would receive 80.52% and CGI would receive 19.48%. The net effect is that CGI would receive an additional $2,420.24. The same result can be achieved by causing the Company to pay out an initial $2,420.24 to CGI before making the distributions to return capital.

8.　　Both sides seek attorneys' fees under the bad-faith exception to the American Rule. Neither side made the necessary showing. In theory, I could award some amount of fees for the derivative claims, *see* 6 *Del. C.* § 18-1004, and I could treat the reduction in CGI's invoice as a derivative recovery. The fee recoveries would be small and partially offsetting. In my view, this case is functionally a two-party dispute. It is not a case where the policy rationales for a fee award based on a derivative recovery apply.

9.　　Within five days of the entry of this order, the trustee shall first satisfy any outstanding amounts due to his firm for administrative expenses, second pay CGI $203,303.76 for its creditor claim (inclusive of pre-judgment interest), third pay CGI $2,420.24, and finally distribute all remaining amounts to Avery and CGI, with 80.52% going to Avery and 19.48% going to CGI. The trustee is authorized to make minor adjustments in the specific amounts if necessary to comply with the spirit of this order. With the Company's affairs wound up, the trustee shall file a certificate of cancellation for the Company. The trustee shall file a notice attesting to compliance with these directives, at which point the trustee is discharged.

10.　　Within 10 days after the filing of the trustee's notice, the parties shall submit a joint letter identifying any remaining actions that need to be taken to bring this matter to conclusion at the trial level. If the parties do not submit a letter, then this order shall

11

constitute the court's final act for purposes of concluding the trial-level proceedings in this case.

_____
Vice Chancellor Laster
April 15, 2019