6

JAMES M. RUSSELL, as Executor of STANLEY L. CONLEY, Deceased, Appellant, v RAYNES ASSOCIATES LIMITED PARTNERSHIP et al., Respondents.

First Department, April 30, 1991

### APPEARANCES OF COUNSEL

*David Ng* of counsel *(Susan A. Saslow* with him on the brief; *Karlsson & Ng, P. C.,* attorneys), for appellant.

*Sherwin Belkin* of counsel *(Joseph Burden* with him on the brief; *Belkin Burden Wenig & Goldman,* attorneys), for respondents other than Manufacturers Hanover Trust.

### OPINION OF THE COURT

ELLERIN, J.

The issue on this appeal is whether plaintiff, the executor of the estate of a rent-stabilized tenant who was in occupancy of the subject apartment at the time a cooperative conversion offering plan was filed, should be permitted to pursue his action for a judgment declaring his right to purchase the shares allocated to decedent's apartment under the particular facts and circumstances of this case.

The building in question is located at 45 East 66th Street, New York City. In March 1987, while plaintiff's decedent was occupying apartment 5W, defendants Raynes Associates Limited Partnership and Raynes Conversions, Inc. (hereinafter Sponsors) issued a noneviction cooperative conversion offering plan which provided that insider offerees, who were defined as bona fide tenants either in occupancy or with a right to renewal or to continued occupancy as of the date of filing, would be given an exclusive period of 90 days in which to purchase their apartments at the insider's price. The plan specifically referred to estates as follows: "Neither the executors or executrix of the estate of a tenant who dies *before the filing date,* nor the estate itself, is a tenant-offeree, unless the executor or executrix or the estate has the legal right to purchase such apartment under applicable law. It should be noted that present case law relating to the right of an executor or executrix of an estate of a deceased tenant to subscribe to purchase the apartment of such deceased tenant is unclear. Accordingly, the Sponsor reserves the right to challenge any Subscription Agreement tendered by an executor or executrix

of the estate of a deceased tenant if the Sponsor believes such executor or executrix does not have a legal right under applicable law to purchase the deceased tenant's apartment." (Emphasis added.)

Plaintiff's decedent, who had signed a "no-buy pledge" as part of a tenant effort to negotiate more favorable terms, died on October 27, 1987 without having tendered a subscription agreement. In January 1988, plaintiff, as executor of the decedent tenant's estate, informed sponsors of the death. In a letter to plaintiff, dated February 9, 1988, the Sponsors set forth their position that "the Offering Plan, by its terms, excludes an estate of a deceased tenant from exercising any rights under the Plan" and that they would "not entertain any exercise of rights by the estate." However, in April 1988, after negotiation with a tenant's group, the Sponsors filed an amendment to the plan which substantially reduced the insider's price for all of the apartments, including the subject apartment, and extended the exclusive period for 30 days. Subsequent to the issuance of this amendment, plaintiff was solicited by defendant M.J. Raynes, Inc., and urged to subscribe. M.J. Raynes, Inc., whose principals are Martin J. Raynes and Robert B. Stang, general partners of sponsor Raynes Associates Limited Partnership, are identified by plaintiff's undisputed allegations as Sponsors' sales agent. According to plaintiff, M.J. Raynes, Inc., not only encouraged plaintiff to allow it to resell the apartment once he had subscribed, but actually showed the apartment to prospective purchasers in hopes that this would come about.

The plan was declared effective on June 13, 1988, one week before expiration of the 15-month period within which the Sponsors were required to obtain the 15% sale of shares (five apartments) necessary to make the plan effective. (See, General Business Law § 352-eeee [2] [a], [c] [i].) However, the plan's effectiveness was subsequently called into question, on June 27, 1988, when the Sponsors were required by the New York State Attorney-General to issue an additional amendment, informing tenant purchasers that they had the right to rescind their subscription agreements and also extending the exclusive period. It appears that this further amendment was required as the result of the Sponsors' failure to inform tenant-purchasers of their right to rescind at the time of the earlier amendment. The import of the amendment was that Sponsors were now required to obtain waivers of the right to rescind from purchasers representing at least 15% of the

shares or the plan would be deemed abandoned. The record is silent on the deadline date by which receipt of these waivers was required.

The exact date upon which plaintiff tendered his subscription agreement is unclear, although the record indicates that it was some time between April 1, 1988 and July 1, 1988. What is clear, however, is that by July 1, 1988 plaintiff, along with four other purchasers, had provided Sponsors with waivers of the right of rescission. Taken together, these five purchasers, who had either already submitted subscription agreements or were doing so contemporaneously with submission of the waivers, represented 15% of outstanding shares. Thereafter, on July 19, 1988, Sponsors rejected plaintiff's subscription agreement solely on the ground that the offering plan excluded the estate of a deceased tenant from exercising any rights under the plan. Significantly, by that date, Sponsors were in possession of subscription agreements and waivers of rights of rescission from purchasers, other than plaintiff, representing at least 15% of the shares. The record does not reveal at exactly what point Sponsors achieved this position.

Upon the Sponsors' rejection of plaintiff's subscription agreement, plaintiff commenced the instant declaratory judgment action seeking a declaration of his entitlement to purchase the shares in question and for specific performance transferring the shares to him and the issuance of a proprietary lease in accordance with the offering plan. Before any extended discovery had taken place, both parties moved for summary judgment. The court granted defendants' motion for dismissal of the complaint on the authority of *De Kovessey v Coronet Props.* (69 NY2d 448) and plaintiff appeals from both the granting of the motion to dismiss and the denial of his own motion for summary judgment on the underlying declaratory judgment action.

Defendant Sponsors have consistently sought to frame the issue solely in terms of the status which the estate of a rent-stabilized tenant occupies in relation to a cooperative conversion plan. If, in fact, the issue here were thus limited, we would affirm the dismissal of the complaint based upon Judge Bellacosa's policy analysis in *De Kovessey v Coronet Props. (supra),* where the Court of Appeals held that the estate of a deceased rent-controlled tenant was not entitled, on either policy or contract grounds, to utilize the unexercised right of such tenant to purchase shares offered in a coopera-

tive conversion plan at the insider's price, even where the conversion plan had been accepted for filing prior to the tenant's death. Critical to that determination was the court's emphasis on the fact that the estate was not using or occupying the apartment within the meaning of General Business Law § 352-eeee at the time the plan was filed and the overriding significance of that factor in light of the purposes of the statutory regulation and control of residential rents and eviction which are to protect such tenants from unreasonable rents and against hardship and disruption during the conversion process (supra, at 455). While De Kovessey dealt with the estate of a rent-controlled statutory tenant rather than an estate that had succeeded to its decedent's rent-stabilized lease, the underlying policy considerations are the same. The Court of Appeals made that clear in Matter of Rubinstein v 160 W. End Owners Corp. (74 NY2d 443) where it held that an estate which had succeeded to a stabilized tenant's lease prior to the time the offering plan was filed had certain limited rights of succession for the purpose of winding up the decedent's affairs but that it could not be considered a tenant in occupancy within the meaning of General Business Law § 352-eeee and was not, therefore, vested with the right to take advantage of the option to purchase the cooperative shares allocated to the apartment.

Plaintiff's argument that the instant situation is distinguishable from that in Matter of Rubinstein v 160 W. End Owners Corp. (supra) because the estate became successor to the lease after the plan was filed, is unavailing. There is no logical rationale for according the estate a different status with respect to the right to purchase cooperative shares depending upon when the offering plan was filed. That fact is wholly irrelevant on the pivotal issue of whether the estate can be considered a tenant in actual occupancy. Whether the offering plan has already been filed, or not, the time when the estate succeeds to the decedent's lease does not change the nature of the estate's relationship to the apartment. In neither case is the estate a tenant in actual possession and occupancy of the premises within the meaning of General Business Law § 352-eeee (2) (d) (ix) and giving an estate insider's rights upon a cooperative conversion, with its "reverse warehousing" and windfall profit implications, merely by virtue of the happenstance that an offering plan had been filed prior to the decedent tenant's death, rather than thereafter, would in no way further the purposes of the regulatory scheme designed to

protect the rights of stabilized tenants who actually occupy their apartments as residences. *(Matter of Rubinstein v 160 W. End Owners Corp., supra.)*

■ Notwithstanding the foregoing, which recognizes that the Sponsors here were not obligated under controlling law to extend an offer to plaintiff, an offering plan may contractually bind a Sponsor to sell an apartment to a party who is not included among the statutorily required offerees *(see, Sachellaridou v Pasent Realty Co.,* 104 AD2d 764). Thus, while under the rationale of *De Kovessey* and *Matter of Rubinstein (supra),* the Sponsors were *not required* to extend an offer to plaintiff, they were not prohibited from doing so and the issue here is whether they, in fact, did so or whether there is a factual issue in that regard which requires a trial.

In order to determine whether such an offer has been made it is necessary to look at both the "terms and conditions of the plan and the conduct of the sponsor or his agent". *(Sachellaridou v Pasent Realty Co., supra,* at 765.) Here, the plan itself, while referring to estates, fails to clearly define their rights and appears deliberately to have left their status in a somewhat ambiguous position, particularly with respect to one in plaintiff's position who became the executor after the filing date. Moreover, the language of the clause does not, as argued by defendant, simply make plaintiff's status as a potential offeree conditioned on his legal rights to succeed to decedent's rights. Indeed, if an estate were legally entitled to so succeed, no provision by Sponsors could affect that right. The language of the provision, with its ambiguities, certainly does not expressly exclude this estate from being a party which could enter into a binding agreement with the Sponsors. On the contrary, the statement in the offering plan that "the sponsor reserves the right to challenge any subscription agreement tendered by an executor or executrix of the estate of a deceased tenant" based on the Sponsors' evaluation of the estate's status contemplates such tenders by estates. While this conditional language in the offering plan lacks the necessary definiteness and "finality of assent" to constitute an offer which would serve to bind the sponsors merely upon the submission of a subscription agreement by an estate *(Brause v Goldman,* 10 AD2d 328, 332, *affd* 9 NY2d 620; 21 NY Jur 2d, Contracts, § 34) the language can be construed as inviting an estate to make an offer in accordance with the plan's terms by way of tendering a subscription agreement which the Sponsors, in turn, would have the right to accept or reject. Signifi-

cantly, acceptance of the offer would occur by the Sponsors' receipt and retention of the agreement without "challenge".

This analysis of the plan's language takes on added significance when assessed in light of the pressure on the Sponsors to achieve the necessary sale of 15% of the shares (five apartments) within the statutory 15-month period in the face of what was apparently a largely successful tenant negotiating strategy. Under General Business Law § 352-eeee (2) (c) (i), in order to be counted toward making the plan effective, the requisite 15% of outstanding shares had to be sold either to "bona fide tenants in occupancy or bona fide purchasers who represent that they intend that they or one or more members of their immediate family occupy the dwelling unit when it becomes vacant." In seeking to achieve this percentage, defendant Sponsors were confronted by the reality that the marketability of the subject apartment to anyone other than plaintiff during the statutory period was highly improbable due to a variety of factors. These included the exclusive period during which only insiders were permitted to purchase their own apartments (ultimately extended to July 1, 1988), the uncertanties surrounding plaintiff's entitlement to insider status throughout the statutory period and, as a practical matter, the fact that plaintiff, as the executor of the deceased tenant, had the right to possess the apartment until the expiration of the decedent's lease on September 30, 1989 *(see, Remford Corp. v Rosenfeld,* 274 App Div 769), thereby inhibiting the ability of Sponsors to show the apartment to others.

In this context, the disputed language in the offering plan provided a situation in which, if the Sponsors were unable to sell the apartment to a qualified outside purchaser, they could either accept a tendered subscription agreement from the estate if necessary to achieve the requisite 15% or could "challenge" the subscription agreement. While a memorandum of the Attorney-General, dated in January 1988, indicated that estates would not be counted as bona fide tenants in occupancy in determining whether the required 15% of shares had been sold, that memorandum in no way prohibited the sale of shares to estates. Although plaintiff could not be counted toward the 15%, the Sponsors still stood to benefit from receipt of plaintiff's subscription agreement by reason of its potential impact on other tenants who, upon believing that the requisite 15% had been sold, would conclude that there was therefore no longer any purpose in refusing to subscribe. It was only after the Sponsors had

obtained subscriptions from such other tenants totaling more than the necessary 15% that plaintiff's agreement was rejected. The potential for abuse in the conversion process inherent in such dealings must be discouraged and requires close scrutiny.

Under the circumstances here present we conclude that, at the very least, there is a question of fact as to whether Sponsors' behavior, both before and after receipt of plaintiff's subscription agreement, resulted in a binding agreement which required denial of the defendants Sponsors' motion for summary judgment on plaintiff's cause of action for a declaratory judgment. While it is clear that Sponsors' letter upon learning of the death of plaintiff's decedent did not change the position taken in the offering plan, since it merely restated the position that plaintiff was not entitled *by law* to succeed to the status of a bona fide tenant in occupancy, the evidence presented by plaintiff strongly supports the position that, subsequent to that letter, Sponsors demonstrated that they considered plaintiff to be a potential subscriber and encouraged him to tender a subscription agreement. The amendment issued in April 1988, lowering the insider's price of all the apartments, made no attempt to exclude the subject apartment, implying that plaintiff was still, at least, invited to make an offer. Most important, are plaintiff's sworn uncontradicted allegations regarding the conduct of Sponsors' closely related sales agent in actively soliciting plaintiff's subscription. Indeed, if it is ultimately established that the conduct and representations of the sales agent were binding on the Sponsors, it could be found that an unconditional offer had been made to plaintiff which resulted in a binding contract immediately upon the tendering of plaintiff's subscription agreement.

■ Moreover, even if Sponsors were not so bound, under the terms of the offering plan itself, which was prepared by Sponsors and must be interpreted to resolve any ambiguities in plaintiff's favor *(Rentways, Inc. v O'Neill Milk & Cream Co.,* 308 NY 342), Sponsors' receipt and retention of the subscription agreement "without challenge" would constitute an acceptance of plaintiff's offer to purchase. It was Sponsors themselves who failed to define how such challenge would be manifested and, more significantly, how long a period of time they could remain silent before their failure to challenge a tendered subscription agreement would be deemed an acceptance.

Although, generally, intent to accept an offer may not be inferred from silence, a party's silence will be deemed an acquiescence where he or she is under such duty to speak that his or her "conduct, accompanied by silence, would be deceptive and beguiling" *(Brennan v National Equitable Inv. Co.,* 247 NY 486, 490) and failure to speak therefore misleads the other party *(Josephine & Anthony Corp. v Horwitz,* 58 AD2d 643; Restatement [Second] of Contracts § 69; 21 NY Jur 2d, Contracts, §§ 30, 50; 1 Williston, Contracts § 66 [3d ed]; *see also, Textron, Inc. v Teleoperator Sys. Corp.,* 554 F Supp 315, 324). Such a duty may be created by a course of conduct *(see, Matter of Catz Am. Sales Corp. [Holleb & Co.],* 272 App Div 689, *affd* 298 NY 504), or, as here, by an explicit statement by the offeree which gives the offeror reason to understand that silence will constitute acceptance. (Restatement [Second] of Contracts § 69, comment *c.)* While it is the responsibility of the court to interpret written agreements (4 Williston, Contracts § 601 [3d ed]), when a finding as to whether the acts of the parties constituted an assent is dependent as well on other evidence from which differing inferences may be drawn, a question of fact arises. *(See, Brown Bros. Elec. Contrs. v Beam Constr. Corp.,* 41 NY2d 397; *Pellegrino v Almasian,* 10 AD2d 507.)* In this case, a question of fact remains as to whether and exactly when, Sponsors' failure to speak came to constitute an acceptance.

Certainly, where a party remains silent with the purpose of misleading the other party, such silence is "inconsistent with honest dealings and * * * may be deemed to be an acquiescence" *(Club Chain v Christopher & Seventh Gourmet,* 74 AD2d 277, 284). Thus, in this case, if Sponsors deliberately remained silent in order to retain the agreement only so long as it was necessary to help in achieving the requisite 15%, their silence would constitute an acceptance.

Moreover, even absent such self-serving purpose, questions of fact would remain as to how long, in light of all the circumstances surrounding the transaction, sponsors could wait before their failure to notify plaintiff that they did not intend to accept could reasonably be interpreted as acquiescence, and whether Sponsors should be held to have accepted plaintiff's offer by retaining the agreement and waiver of rescission until July 19, 1988. It should be noted in this context that, since it was the Sponsors themselves who gave plaintiff reason to believe that silence would constitute acceptance, it is not necessary for plaintiff to show that Sponsors

actually intended to accept, as long as plaintiff demonstrates that he reasonably believed that they had done so. (Restatement [Second] of Contracts § 69.)

Since the record is unclear on various factual issues including, *inter alia,* precisely when plaintiff submitted his subscription agreement, the parameters of the relationship between Sponsors and their sales agent, the number of qualified purchasers who had committed themselves between April and July 1988, and the precise dates of such commitments, further discovery appears necessary.

■ It should be noted that while plaintiff seeks a declaratory judgment declaring his right to purchase the shares allocated to the subject apartment and specific performance transferring the shares to him and issuing to him a proprietary lease in accordance with the offering plan, the record is also unclear as to whether the shares appurtenant to the apartment have since been sold to a bona fide purchaser. If such is the case, plaintiff's remedies would be limited to damages. *(See, Da Silva v Musso,* 76 NY2d 436.)

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (David H. Edwards, Jr., J.), entered August 18, 1989, which, *inter alia,* denied plaintiff's motion for summary judgment and granted defendants' motion for summary judgment dismissing the complaint, should be reversed insofar as appealed from, on the law, defendants' motion denied, and the complaint reinstated, with costs.

SULLIVAN, J. P., CARRO, WALLACH and RUBIN, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered on August 18, 1989, reversed insofar as appealed from, on the law, defendants' motion for summary judgment denied, and the complaint reinstated, with costs.