OPINION OF THE COURT
Jack M. Battaglia, J.
In this summary holdover proceeding commenced by notice of petition and petition dated October 1, 2002, petitioner Henry Palumbo seeks possession of apartment 2B at 376 St. Johns Place, as well as use and occupancy and legal fees. In their verified answer dated November 12, respondents Tara Deveaux Donalds and Frank Donalds assert various “affirmative defenses” and a counterclaim for legal fees.
Respondents have occupied the apartment since September 1, 1998 pursuant to a series of written leases. The most recent lease agreement provides for a one-year term beginning September 1, 2001 and ending August 31, 2002, with a monthly rental of $1,950. For purposes of this proceeding, the most significant additional provisions of the lease state that “Landlord may at reasonable times enter the Apartment to * * * show it to possible buyers, lenders or tenants within 60 days prior to lease expiration 7/1/02” (para 10); that the “Lease may be changed only by an agreement in writing signed by and delivered to each party” (para 31); and that “Tenant agrees to give Landlord 90 day [s’] notice” (para 35).
Petitioner sufficiently established his ownership of the apartment, first as a co-op and later as a condominium. He introduced into evidence the original share certificate dated May 1, 1996, representing his interest in the corporation; copies of the declaration establishing a plan for condominium ownership dated March 10, 1998 and a first amendment dated November 23, 1999; unexecuted copies of a unit deed and power of attorney, both dated July 2000; and a copy of a “replacement deed” dated December 6, 2002, certified pursuant to CPLR 2105. Bernard H. Allen, the attorney who handled the conversion from co-op to condo and who drafted all of the documents, including the unit deed, testified to having forwarded the orig *677 inal unit deed for petitioner’s apartment to the title company for recording. He also testified to having recognized the signatures on the deed to be those of the corporation’s officers. When the deed was not returned, he investigated, and it was determined that the deed was lost. He then prepared the “replacement deed” and delivered it for recording. Mr. Allen’s testimony was sufficient foundation to allow the unexecuted copy of the unit deed, which he said was identical to the original, to serve as competent secondary evidence of the contents of the original. (See Schozer v William, Penn Life Ins. Co. of N.Y., 84 NY2d 639, 644 [1994]; Glatter v Borten, 233 AD2d 166, 168 [1st Dept 1996].)
A number of important matters are not in dispute: respondents remained in possession beyond the August 31 expiration date specified in the written lease; respondents surrendered possession on December 23, when they returned the keys to petitioner in court; petitioner consented to respondents’ continued possession for the month of September, but insisted that respondents vacate by the end of that month; respondents tendered, and petitioner accepted, rent for that month, and, after commencement of this proceeding, rent was tendered and accepted for October and November pursuant to stipulation that no prejudice would result.
30-Day Notice to Quit
Petitioner contends that the parties’ conversations during the summer and early fall constituted an oral extension of the term of the written lease for the month of September only; that petitioner was entitled to possession of the premises at the end of that month, without any requirement for notice to quit; that, by reason of respondents’ holdover, and breach of the lease provision for access, petitioner was deprived of the opportunity to rent the apartment to others and, as a result, lost continuing rental income.
Respondents maintain that they never agreed to an extension of the lease for the month of September only, and that such an agreement would be contrary to the lease provision prohibiting oral modification; that a month-to-month tenancy was created after the expiration of the lease, which could not be terminated without a 30-day notice to quit; and that neither by reason of any holdover nor the breach of the lease provision for access are they liable for any lost rental income.
Clearly, the parties’ conversations and their legal consequence will determine the nature of the parties’ relationship after August 31. Unfortunately, and as might be expected, the *678 parties offer different versions of the conversations. Also, and this might be less expected, the legal consequence is not entirely clear.
Reviewing the law first, to provide context for a discussion of the evidence, it is clear that, absent a statute, neither the landlord nor the tenant need give notice to quit in order to terminate a lease with a definite term. (See Adams v City of Cohoes, 127 NY 175, 182-184 [1891]; North 34th Co. v Wedgewood Garage, 138 Misc 2d 1027, 1028 [Civ Ct, NY County 1988].) “[W]here the duration of the term is fixed, there is no rule nor any reason for a rule, requiring any notice to quit to be given.” (Adams v City of Cohoes, 127 NY at 182, supra.) A distinction used to be made between a monthly tenancy, which was for a fixed term and ended without notice, and a month-to-month tenancy, which was for an indefinite term and continued until terminated by notice. (See Hand v Knaul, 116 Misc 714, 716-717 [Onondaga County Ct 1921].) However, because of statute, the distinction is now meaningless, at least as far as notice to quit is concerned. (See Real Property Law §§ 232-a, 232-b; Pecoraro v Ryan, 39 Misc 2d 949, 949 [Civ Ct, Kings County 1963].)
Real Property Law § 232-a requires that, before a tenant under either a monthly tenancy or month-to-month tenancy may be removed on grounds of holding over, the landlord must serve the tenant with a 30-day notice to quit in accordance with the statute. For summary holdover proceedings, at least, the failure to serve the notice deprives the court of subject matter jurisdiction. (See Rosen v Wade, 99 Misc 2d 1114, 1115 [Civ Ct, NY County 1979].)
Real Property Law § 232-c provides that, if a tenant whose term is longer than one month holds over, and “if the landlord shall accept rent for any period subsequent to the expiration of such term, then, unless an agreement either express or implied is made providing otherwise, the tenancy created * * * shall be a tenancy from month to month.” (Emphasis supplied.) This statute abolished the “rule at common law * * * that a tenant’s holding over after the expiration of the term imposed upon the tenant (at the landlord’s option) an obligation for a new term even contrary to the tenant’s desire or intention.” (United Mut. Life Ins. Co. v ICBC Corp., 64 AD2d 506, 508 [1st Dept 1978].) Whether an agreement for a term different than month to month may be implied is a question of fact. (See id. at 508-509; see also 28 Mott St. Co. v Summit Import Corp., 34 AD2d 144, 146 [1st Dept 1970], affd 28 NY2d 508 [1971].)
*679 There is an apparent inconsistency in authority on whether a lease extension for a month, assuming one here, requires a 30-day notice to quit. In Coronet Props. Co. v Jennie & Co. Film Prods. (121 Misc 2d 873 [Civ Ct, NY County 1983]), the lease expired by its terms on August 31, but on August 6, the landlord notified tenant “that it elected to terminate [the tenant’s] occupancy at the expiration of the lease term * * * and that eviction proceedings would be commenced unless it vacated by September 30”; the landlord then accepted and cashed the tenant’s check for September’s rent. (Id. at 873-874.) The court stated that “in order to remove the tenant at the end of that month, service of a 30-day notice under section 232-a * * * was required.” (Id. at 875.)
In Metro Spanish Food Wholesalers v Jetro Cash-And-Carry Enters. (137 Misc 2d 54 [Civ Ct, Bronx County 1987]), the lease provided for expiration on February 15, but the “lease term was extended until March 3 * * * and rent for the extension was paid by check”; on March 30, the landlord notified the tenant that it did not wish to extend the lease beyond March 31. (Id. at 56.) In response to the tenant’s contention that a 30-day notice was required to terminate, the court found first that no month-to-month tenancy was created pursuant to Real Property Law § 232-c for the period subsequent to March 31, because the landlord did not accept any rent from the tenant for that period. (Id. at 59.) With respect to the period after the February 15 expiration date, “[w]hile the landlord did accept rent after February 15 * * * it was with the clear understanding that [the extension] was only for a period of time up to March 31 * * * This acceptance of the rent with the understanding that the extension was only for another 45 days clearly prevented the creation of a month-to-month tenancy.” (Id.)
The facts in Coronet Props, and Metro Spanish, as revealed by the opinions, do not seem that different. These decisions might be reconciled, however, by noting that in Metro Spanish the court found that rent was accepted postexpiration with the “clear understanding” that the extension was limited to 45 days, while in Coronet Props, it might be said that the landlord merely announced that it would forbear from seeking possession until the end of the following month. The court in Coronet Props, may have been influenced by the fact that there was an extension (if that is what it was) for one month, similar to the monthly and month-to-month tenancies subject to section 232-a. But analytically the existence of “an agreement either *680 express or implied” for purposes of section 232-c does not depend on whether the extended term is for one month, or 15 days, or 45 days.
This court concludes that the acceptance of postexpiration rent does not create a tenancy that can only be terminated by a 30-day notice in accordance with section 232-a, if the rent is paid pursuant to an agreement for an extension of the term of definite duration, whatever that duration may be. The court also concludes that there was such an agreement in this case.
As noted above, the lease agreement contains a provision that “Tenant agrees to give Landlord 90 day notice,” but does not state the intended subject matter of the notice. Petitioner Henry Palumbo testified that the tenants were to give 90 days’ notice if they wanted to extend the lease. Only Tara Donalds testified on behalf of the tenants, and she did not dispute Mr. Palumbo’s understanding of the meaning of the notice provision. Mr. Palumbo telephoned the tenants in May 2002, and was told that they would be purchasing their own apartment and would vacate at the expiration of the lease term on August 31. Neither Mr. Palumbo nor Ms. Donalds testified to any other conversation between Mr. Palumbo and either of the tenants concerning possession of the apartment.
Rather, all further discussion concerning the apartment took place between Fran Pauley, Mr. Palumbo’s wife (who acted as his agent concerning the apartment), and the tenants, primarily Tara Donalds. Ms. Pauley and Ms. Donalds spoke in July or early August; Ms. Donalds requested an extension of the lease because the apartment that the tenants were purchasing would not be available by August 31. After consulting Mr. Palumbo, Ms. Pauley told Ms. Donalds that he would agree to an extension only to the end of September. According to Ms. Pauley, Ms. Donalds agreed to vacate by the end of September. Ms. Donalds maintains, however, that she stated that more time was needed. Ms. Donalds also maintains that she was led to believe at this point that additional time would be given if the tenants found a new tenant for the apartment, which, of course, they did not do.
Ms. Pauley and Ms. Donalds spoke again in mid-September, and they agree that, at this point, Ms. Donalds would not say that the apartment would be vacated by the end of the month. Ms. Pauley testified to a subsequent conversation with Mr. Donalds (who, again, did not testify), during which he agreed to September 30. According to Ms. Pauley, the check for September’s rent, which Mr. Palumbo had been holding after receipt earlier in the month, was cashed.
*681 The court concludes from the testimony that the parties agreed to extend the written lease to September 30 only. As in Metro Spanish (137 Misc 2d 54, supra), the parties had a “clear understanding” that the extension was limited to the end of September.
It is axiomatic that “the existence of a binding contract is not dependent on the subjective intent” of the parties; rather, the existence and terms of a contract are determined by the “objective manifestations of the intent of the parties as gathered by their expressed words and deeds.” (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d 397, 399 [1977]; Matter of Ahern v South Buffalo Ry. Co., 303 NY 545, 560-561 [1952]; Cutter v Peterson, 203 AD2d 812, 814 [3d Dept 1994].) Even silence may form an agreement when the failure to speak misleads the other party. (See Russell v Raynes Assoc. Ltd. Partnership, 166 AD2d 6, 16, 17 [1st Dept 1991].) “[T]he aim is a practical interpretation of the expressions of the parties,” particularly when “the actions of neither party appears to have been guided by the norms and forms of legal counsel.” (Brown Bros. Elec. Contrs. v Beam Constr. Corp., 41 NY2d at 400, supra.)
The court’s conclusion is confirmed, but not determined, by Ms. Donalds’s affidavit, filed in connection with the tenants’ motion for summary judgment. Ms. Donalds stated that “[i]n August 2002, in a telephone conversation I had with Landlord’s wife, she orally consented to our remaining in the premises one additional month, through September 2002.” (Affidavit in support of respondents’ motion for summary judgment If 5.) In the affidavit, Ms. Donalds acknowledges that the September rent check was not cashed until late in the month, after additional discussion between the parties. (Id. 6-7.)
Respondents maintain, however, that there could not have been an enforceable extension of the written contract, because of the provision in the lease, noted above, that precludes oral changes and the statute that makes the lease provision enforceable, General Obligations Law § 15-301. But, assuming its applicability, the statute is subject to “exceptions” such as waiver, equitable estoppel, and partial performance. (See 310 S. Broadway Corp. v Barrier Gas Serv., 224 AD2d 409, 410 [2d Dept 1996].) These exceptions apply to oral agreements that extend the duration of the written agreement. (See Bakhshandeh v American Cyanamid Co., 8 AD2d 35, 38 [1st Dept 1959], affd 8 NY2d 981 [1960]; Greene v First Fed. Sav. & Loan Assn. of Rochester, 122 AD2d 593, 594 [4th Dept 1986].)
There is no dispute that the parties agreed that the Donaldses could remain in the apartment for the month of *682 September, paying the stipulated rent. That agreement was fully executed; Mr. Palumbo took no action to remove the Donaldses from the apartment, and the rent was paid. The additional part of the agreement, that the Donaldses would vacate at the end of September, did not in any sense change the written lease.
Moreover, having induced Mr. Palumbo to allow them to remain in the apartment and to accept September’s rent by their agreement to vacate at the end of the month, it would be manifestly inequitable to allow them to rely on acceptance of the rent as establishing their right to stay longer. They should not have the benefit of part of the oral agreement, while disavowing the rest.
Notwithstanding, therefore, the lack of a 30-day notice, the tenancy expired at the end of September. “In a holdover proceeding, the petitioner is entitled to seek use and occupation for the fair and reasonable value of the premises during the period of such use and occupation.” (1400 Broadway Assoc. v Lee & Co. of N.Y., 161 Misc 2d 497, 500 [Civ Ct, NY County 1994]; see also Vernon v Brown, 40 App Div 204, 205 [2d Dept 1899].) The rent reserved under an expired lease is not conclusive on the fair and reasonable value, but is probative. (See Beacway Operating Corp. v Concert Arts Socy., 123 Misc 2d 452, 453 [Civ Ct, NY County 1984]; see also Real Property Law § 220.) At the minimum, therefore, petitioner is entitled to use and occupation for the 23 days of December that the respondents retained possession but have not paid rent.
Lost Rental Income
Case law recognizes that, in an appropriate case, a landlord may recover “consequential” or “special” damages from a holdover tenant, including rental income from a third party that is lost as a result of the holdover. (See 1009 Second Ave. Assoc. v New York City Off-Track Betting Corp., 248 AD2d 106, 108-109 [1st Dept 1998]; Plaza Madison Assoc. v Newmark, Posner & Mitchell, 110 AD2d 599 [1st Dept 1985]; 437 Madison Ave. Assoc. v A.T. Kearney, Inc., 127 Misc 2d 37, 38-39 [App Term, 1st Dept 1985]; Cohen v Brown, Harris Stevens, 132 Misc 2d 85, 86-87 [Sup Ct, NY County 1986]; Schreiber v Kleban, 63 Misc 2d 628, 629-630 [Civ Ct, NY County 1970]; Nodine v State of New York, 192 Misc 572, 577-578 [Ct Cl 1948]; Matter of Weinberg, 177 Misc 587, 588-589 [Sur Ct, NY County 1941]; 650 Park Ave. Corp. v McRae, 665 F Supp 228, 234-237 [SD NY 1987].)
The holdover tenant’s liability for consequential damages is determined primarily by contract principles, although tort *683 concepts and principles also appear. (See, for example, 437 Madison Ave. Assoc. v A.T. Kearney, Inc., 127 Misc 2d at 37, supra; Nodine v State of New York, 192 Misc at 577-578, supra; 650 Park Ave. Corp. v McRae, 665 F Supp at 236, supra.) Under the age-old rule of Hadley v Baxendale (9 Exch 341, 156 Eng Rep 145), “recoverable damages are limited to liability the defendant fairly may be supposed to have assumed consciously, or to have warranted the plaintiff reasonably to suppose that it assumed, when the contract was made.” (1009 Second Ave. Assoc, v New York City Off-Track Betting Corp., 248 AD2d at 109, supra [internal quotation marks and emphasis omitted].) A common formulation of the rule speaks of “damages [that] were reasonably foreseeable by the breaching party at the time of contract.” (437 Madison Ave. Assoc. v A.T. Kearney, Inc., 127 Misc 2d at 38-39, supra; see also Cohen v Brown, Harris Stevens, 132 Misc 2d at 87, supra.)
Important to determining a holdover tenant’s liability for consequential damages are the provisions of the parties’ lease agreement. And so, where a written lease contains an express provision imposing liability for consequential damages on the holdover tenant under specified circumstances and conditions, the tenant will not be liable under other circumstances and conditions. (See 1009 Second Ave. Assoc. v New York City Off Track Betting Corp., 248 AD2d at 108, supra.)
Similar principles apply when the tenant has breached an express provision of the lease relating to surrender of the premises, such as an obligation to repair or restore the premises. That is, the tenant will be liable for consequential damages, including lost rent, that were reasonably foreseeable at the time of contracting, unless the contract expressly deals with the consequences. (See Gettner v Getty Oil Co., 266 AD2d 342, 343 [2d Dept 1999]; Chemical Bank v Stahl, 255 AD2d 126, 127 [1st Dept 1998]; 1035 Fifth Ave. Corp. v Trippe, 267 App Div 131 [1st Dept 1943].) A tenant’s refusal or failure to give the landlord access to the premises in accordance with a lease provision may also constitute a breach compensable in damages. (See Westminster Props. v Teicher, 179 AD2d 453 [1st Dept 1992].)
Here, the Donaldses could foresee that Mr. Palumbo would lose rental income beyond the period during which they retained possession of the apartment. They could foresee it when the written lease was executed and when the extension was orally agreed to, although the latter is sufficient. (See 650 Park Ave. Corp. v McRae, 665 F Supp at 235, supra; see also *684 Cohen v Brown, Harris Stevens, 132 Misc 2d at 87, supra.) The written lease itself provides evidence of what was contemplated and foreseen at the time of its execution. As noted above, respondents agreed “to give Landlord 90 day [s’] notice” of their intent as to renewal, and to allow access to prospective tenants “within 60 days prior to lease expiration 7/1/02.” These provisions were not part of the printed form lease, but were added by hand; the notice provision was written by Ms. Donalds. Certainly, the provisions were the product of discussion and negotiation.
Ms. Donalds acknowledged at trial that, no later than mid-September, she knew that Mr. Palumbo was concerned about rerenting during the holidays, and that his concern was the reason he would only agree to an extension until the end of September. According to Ms. Pauley, in September she told Ms. Donalds in a telephone conversation that two real estate agents who had been commissioned to rerent the apartment had complained that respondents had been uncooperative, and Ms. Donalds hung up on her. But Ms. Donalds maintains that Ms. Pauley told her that the agents could not show the apartment until it was vacant.
Nonetheless, Ms. Donalds acknowledged that she was contacted by an agent, who showed the apartment on the day after Thanksgiving. She testified further that there was no further contact until two days before trial, December 21. Petitioner presented no evidence, other than the testimony of Ms. Pauley just described above, of his efforts or any real estate agent’s efforts to advertise or otherwise solicit prospective tenants. Nor was there any evidence other than Ms. Pauley’s hearsay testimony that respondents were uncooperative in allowing access for prospective tenants.
Although not strictly relevant to foreseeability, courts have considered “extenuating circumstances,” such as “the tenant’s good faith attempts to relocate, and external constraints preventing the tenant from doing so.” (650 Park Ave. Corp. v McRae, 665 F Supp at 236, 235, supra; see also Schreiber v Kleban, 63 Misc 2d at 629, supra; Matter of Weinberg, 177 Misc at 589, supra.) And so, one court expressed “serious reservations” about allowing consequential damages where the “holdover was caused by the failure of a third party to remove from premises duly rented by the party holding over,” but then recognized a “significant community interest in limiting the harm by encouraging the first tenant adversely affected by a holdover to seek temporary accommodations rather than *685 spread the disruption to an ever widening circle.” (Schreiber v Kleban, 63 Misc 2d at 629, supra.)
Another court, while acknowledging that “[consideration of these additional factors is sensible because a holdover action sounds in tort as well as contract,” suggests that “when possession is willfully withheld far beyond the expiration of the lease, it would seem appropriate to dispense altogether with the requirement that damages be foreseeable at the start of the lease: The ongoing, unauthorized holding over must at some point be deemed a wrong wholly distinct from the breach of the lease.” (650 Park Ave. Corp. v McRae, 665 F Supp at 236, supra.)
Here, particularly in light of the seasonal difficulty in rerent-ing of which respondents were aware (see 1035 Fifth Ave. Corp. v Trippe, 267 App Div 131, supra), lost rental income, to the extent proved, should be awarded. Respondents retained possession for almost four months beyond the original expiration date, and almost three months beyond the one-month extension. No one can fault the Donaldses for wanting to own rather than rent. Home and apartment ownership contribute to the economic and social stability of individuals and communities alike. Nor can we blame them for wanting to avoid the disruption in their lives that would result from finding temporary place(s) for themselves and their belongings. But neither is it somehow more appropriate that Mr. Palumbo bear responsibility for minimizing inconvenience in their transition to ownership, and the Donaldses could have avoided any disruption by simply agreeing with Mr. Palumbo that they would either stay, or compensate him for a period of vacancy, over the holidays.
The purchase and sale of a home or apartment is complex in the city, and delays are almost inevitable. There is no evidence that the Donaldses caused any delay here, but they were certainly better able than Mr. Palumbo to anticipate delay and perhaps affect it. And if another party to their purchase and sale transaction was at fault, only the Donaldses could have shifted any resulting loss to that party. Not all landlords are multi-unit businesses able to absorb the loss of rental income. Many landlords own only one rental unit, usually in a two-unit building, and are dependent upon uninterrupted rental income for payment of the monthly mortgage, quarterly taxes and regular maintenance of the building. As prospective owners themselves, the Donaldses would have, or should have, known that.
*686 Of course, the landlord bears the burden of proving the amount of the lost rental income. (See Gettner v Getty Oil Co., 266 AD2d at 343-344, supra; Allen v Kowalewski, 239 AD2d 879, 880 [4th Dept 1997]; Malerba v Warren, 96 AD2d 529, 529 [2d Dept 1983]; Schreiber v Kleban, 63 Misc 2d at 630, supra.) And, in this judicial district, a landlord has a duty to mitigate damages by reletting the premises when the tenant leaves before the end of the term. (See Paragon Indus. v Williams, 122 Misc 2d 628 [App Term, 2d Dept 1983].) The same should be true when the tenant stays beyond the end of the term. (See 650 Park Ave. Corp. v McRae, 665 F Supp at 235, supra.) The landlord must make “reasonable and diligent efforts to rerent the premises.” (See Goldman v Orange County Ch., N.Y. State Assn. for Retarded Children, 121 AD2d 683, 685 [2d Dept 1986].)
But there was no evidence here as to the amount of rental of income that would be lost because of the holdover, and, except for listing the apartment with two real estate agents, one of whom showed the apartment the day after Thanksgiving, there was no evidence of the efforts to rerent the premises. However, since petitioner did not know until the day before Christmas Eve that the apartment would be surrendered on that day, it could not realistically be expected that the apartment would be rented for the balance of the month of December.
Indeed, the difficulty of renting an apartment between Thanksgiving and New Year’s Day was the premise for much in the dealings between petitioner and respondents, and the court may take judicial notice of this fundamental of the city real estate market. (See East Four-Forty Assoc. v Ewell, 138 Misc 2d 235, 240 n 3 [App Term, 1st Dept 1988]; McLaughlin v De Luca, 183 Misc 894, 896 [Mun Ct, Queens County 1944]; President & Directors of Manhattan Co. v Williams, 152 Misc 901, 902 [Sup Ct, NY County 1934]; In re Levenhar, 30 BR 976, 981 [ED NY 1983].) It is supported as well by the testimony of Ms. Pauley, who, in addition to being petitioner’s wife, was the managing agent of the cooperative corporation and is the managing agent of the condominium corporation, and, therefore, speaks with some expertise.
In the absence of evidence, however, of petitioner’s efforts after December 23 to rent the apartment and the eventual date of renting, there is insufficient basis for an award of lost rental income beyond the end of December. The court rejects petitioner’s contention that, because respondents did not give petitioner 90 days’ notice prior to vacating the premises, petitioner should *687 be awarded use and occupancy for that period of time. (See petitioner’s posttrial mem If 23.) Not only does the contention fail to reflect the meaning of the notice provision as Mr. Palumbo testified to it, the contention is inconsistent with petitioner’s position that the tenancy expired of its own terms on September 30. Moreover, assuming that the failure to give notice of an intent to vacate will in an appropriate case sustain liability for lost rental income, the amount of the loss must still be proved in accordance with the rules already explicated. Petitioner’s claim for loss after December 31 will be resolved in supplemental proceedings in connection with petitioner’s inevitable motion for legal fees, or will be severed for plenary disposition.
For the present, judgment is awarded to petitioner for $1,950, with interest from December 1, 2002, plus costs.